# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J. Fisher, Jr.                                                                    Elisabeth A. Shumaker
Clerk                                                                                         Chief Deputy Clerk

July 1, 1999


**TO:**   ALL RECIPIENTS OF THE OPINION

**RE:**   98-6249, *United States v. Fortier*
          Filed on June 30, 1999

The slip opinion filed in this matter contains a clerical error on page 26, beginning at line 5.  The sentence "Nor does the Sentencing Commission provide any guidance regarding application of those guidelines" should be deleted from the opinion.

A corrected copy of page 26 is attached.

                                        Sincerely,
                                        Patrick Fisher, Clerk of Court


                                        By:    Keith Nelson
                                               Deputy Clerk


encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 30 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MICHAEL J. FORTIER,

    Defendant-Appellant.

No. 98-6249

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CR-95-111-VB)**

Michael G. McGuire, Tulsa, Oklahoma, for Defendant-Appellant.

Sean Connelly (Patrick M. Ryan, United States Attorney, Western District of Oklahoma, with him on the brief), Special Attorney to the U.S. Attorney General, Denver, Colorado, for Plaintiff-Appellee.

Before **PORFILIO**, **MCWILLIAMS**, and **BALDOCK**, Circuit Judges.

**PORFILIO**, Circuit Judge.

    Michael Joseph Fortier appeals from his sentence after pleading guilty to

conspiring to transport stolen firearms, 18 U.S.C. § 371, transporting stolen firearms,

§§ 922(i), 924(a)(2), making a materially false statement to the FBI, § 1001, and misprision of a felony, § 4. The trial court sentenced the defendant to 144 months of imprisonment, three years of supervised release, $200,000 in fines, and $4,100 in restitution. Mr. Fortier has admitted to receiving stolen firearms from Timothy James McVeigh, selling those arms, and then returning some of the proceeds to McVeigh and Terry Lynn Nichols. McVeigh and Nichols allegedly used the proceeds to help fund the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma.

Mr. Fortier submits six grounds for vacating his sentence. He argues the district court erred when it (1) declined to change the venue for sentencing; (2) used statements made pursuant to a plea agreement to determine the applicable guideline range; (3) sentenced him based on the guideline for first-degree murder; (4) departed downward only two levels for substantial assistance; (5) refused to depart downward based on extraordinary acceptance of responsibility; and (6) ordered $200,000 in fines. We agree with Mr. Fortier on his third and sixth points and therefore vacate his sentence and remand for resentencing.

## I. Factual and Procedural Background

### A.

The circumstances leading to this appeal stem from Michael Fortier's association with Timothy McVeigh and Terry Nichols, the masterminds behind the bombing of the

Murrah Federal Building in Oklahoma City. The specifics of the bombing are fully set forth in our decision of McVeigh's appeal. *See United States v. McVeigh*, 153 F.3d 1166, 1176-79 (10th Cir. 1998), *cert. denied*, --- U.S. ---, 119 S. Ct. 1148 (1999). Mr. Fortier was not charged as a conspirator in the bombing and thus the various details pertinent to his co-defendants' participation in that offense need not be recounted here. Instead, we focus on the facts surrounding Mr. Fortier's receipt and sale of the stolen firearms, his awareness of the larger conspiracy to destroy the Murrah Federal Building, and the connection, if any, between the offenses.

Mr. Fortier first learned of the bombing conspiracy in September 1994, when McVeigh, the primary agent provocateur, tried to recruit him by letter. The letter told the defendant that McVeigh and Nichols, both of whom Mr. Fortier knew from their service together in the United States Army, had decided to take some type of positive offensive action against the federal government. Mr. Fortier did not reject the solicitation but instead wrote back asking what McVeigh had meant by taking action. At a subsequent meeting in Mr. Fortier's home in Arizona, McVeigh explained that he and Nichols planned to blow up a federal building. With these details on the table, McVeigh renewed the invitation to join the conspiracy, but Mr. Fortier declined.

McVeigh later informed Mr. Fortier that he and Nichols had stolen some explosives and intended to use them to bomb the federal building in Oklahoma City on the two-year anniversary of the destruction of the Branch Davidian compound in Waco,

Texas. *See United States v. Branch*, 91 F.3d 699, 709-10 (5th Cir. 1996) (describing the federal government's ill-fated raid at Waco that resulted in eighty-two deaths), *cert. denied*, 520 U.S. 1185, 117 S. Ct. 1466 (1997). McVeigh chose the federal building in Oklahoma City, the defendant learned, because the orders for the attack at Waco originated in the building, the building housed people involved in the Waco raid, and the building's U-shape and glass front made it an easy target. Mr. Fortier expressed concern about the innocent people who would be killed by the bomb, but McVeigh dismissed them as persons who had to die because they served an evil system.

In late October 1994, McVeigh then told Mr. Fortier about a plan to rob an Arkansas gun collector as a means of funding the conspiracy. Nichols had grown tired of paying his and McVeigh's expenses. The robbery, which McVeigh characterized as a "fund-raiser," was designed to solve the problem. Soon thereafter, Nichols executed the plan and robbed Roger Moore of 78 firearms, cash, precious metals, and other valuables.

One month later, in mid-December, McVeigh asked Mr. Fortier to accompany him to Kansas; in exchange, McVeigh promised to give Mr. Fortier some of the stolen firearms. The defendant agreed and took some time off from work for what he understood was probably a "shady deal" involving the stolen guns. On the way to Kansas, McVeigh drove by the Murrah Federal Building in Oklahoma City, gesturing that the edifice was the intended target. McVeigh further explained the details of the bombing to include placing the bomb in a Ryder truck to be parked in front of the building. He

asked Mr. Fortier if such a large truck would fit in the driveway in front of the building; Mr. Fortier opined that it would. McVeigh then drove into an alley to point out a parking spot where Nichols would either drop off a getaway car ahead of time or else wait for McVeigh on the day of the bombing. Mr. Fortier and McVeigh then left Oklahoma City for Kansas.

Soon after, the men arrived in Council Grove, Kansas. The two stopped at a storage unit where McVeigh had stored the firearms stolen from Roger Moore. McVeigh removed several of the guns, and the two then spent the night at a hotel. The following day, Mr. Fortier rented a car and he and McVeigh returned to the storage locker. McVeigh selected 20 to 25 guns from the locker and loaded them into the defendant's rental car. Mr. Fortier then drove back alone to Arizona. Once home, he moved the weapons into his house.

Mr. Fortier next saw McVeigh in January 1995 at a hotel in Kingman, Arizona. McVeigh asked the defendant if he had sold any of the stolen weapons. Mr. Fortier responded that he had not, and McVeigh became upset. McVeigh then arranged for the defendant to sell the firearms at various gun exhibitions. The first of these, which both Mr. Fortier and McVeigh attended, was in Reno, Nevada, in early February 1995. Mr. Fortier made approximately $2,100 from sales of firearms at that show. After the exhibition, McVeigh informed Mr. Fortier that Nichols was angry because McVeigh had given the defendant some of the stolen weapons; Nichols wanted $2,000 in return. Mr.

- 5 -

Fortier immediately gave McVeigh $1,000 with the understanding it would then be sent to Nichols.  After attending two more gun shows in February and March 1995--during one of which he was again accompanied by McVeigh--Mr. Fortier gave McVeigh an additional $1,000.

During the months of February and March 1995, McVeigh again sought to recruit Mr. Fortier's participation in the larger conspiracy to destroy the Murrah Federal Building.  Specifically, he wanted the defendant to mix the bomb components and assist in the post-bombing escape plan.  Mr. Fortier declined both requests.

The defendant saw McVeigh for the last time on April 12, 1995, when Mr. Fortier and his wife Lori went to McVeigh's hotel room to return some books McVeigh had loaned them several days earlier.  The meeting was tense, and McVeigh told the defendant that they were on very different paths in life and could no longer be friends. The Fortiers left and did not see McVeigh again until the trial.  One week later, at 9:02 in the morning, a massive explosion tore apart the Murrah Federal Building killing 168 people and injuring hundreds more.

**B.**

Less than a month after the bombing, Michael and Lori Fortier were summoned to testify before the federal grand jury investigating the bombing.  Upon arriving in Oklahoma City, the Fortiers met with members of the FBI and ultimately agreed to

cooperate truthfully in the investigation and prosecution of the bombing.  As part of his deal with the government, Mr. Fortier pleaded guilty to conspiring to transport stolen firearms, 18 U.S.C. § 371, transporting stolen firearms, §§ 922(i), 924(a)(2), making a materially false statement to the FBI, § 1001, and misprision of a felony, § 4.  He also testified as the prosecution's principal witness against McVeigh and Nichols in their respective trials.  In exchange, the government agreed to inform the sentencing court of the extent and value of Mr. Fortier's cooperation and to bring no additional, related charges against him.

Chief Judge Seymour of our court specially appointed Chief Judge Van Bebber of the District of Kansas to sit by designation in the Western District of Oklahoma to handle Mr. Fortier's sentencing.  Soon after that appointment, the court held a hearing to resolve disputed sentencing issues.  The court considered information obtained from the Presentence Report, statements Mr. Fortier made in the course of cooperating with the government, and the record and transcripts of the McVeigh and Nichols trials.  The court also admitted, as part of the record, a stipulation of facts submitted by the parties.  The stipulation provides in pertinent part:

> The United States has no evidence that when Fortier received the firearms from McVeigh [in December 1994] there was any agreement, promise or condition that Fortier would sell the firearms and return part of the proceeds to McVeigh and/or Nichols.
>
> . . . .

> The United States has no evidence tracing to any bombing expenditure . . . the $2,000 given to McVeigh by Fortier for Nichols. The United States also has no direct evidence that Michael or Lori Fortier had actual knowledge that this $2,000 would be or was used to further or facilitate the bombing conspiracy.

ROA, Vol. I, Doc. 133, ¶¶ 5 & 12.

The district court used the 1994 Sentencing Guidelines Manual and adopted the factual findings and guideline application suggested in the Presentence Report. Following the probation officer's recommendation, the court began by consulting section 2K2.1, the guideline applicable to the unlawful transportation of firearms. *See* 1994 U.S.S.G. App. A. The court set Mr. Fortier's base offense level at 14 because he was an unlawful user of a controlled substance. *See id.* § 2K2.1(a)(6). The district court then added four levels as a specific offense characteristic because of the number of firearms Mr. Fortier transported, *see id.* § 2K2.1(b)(1)(D), and another four levels because he had used or possessed a firearm "in connection with another felony offense," *id.* § 2K2.1(b)(5), namely the bombing conspiracy. In sum, after application of the base offense level and specific offense characteristics found in section 2K2.1, the district court concluded Mr. Fortier's offense level was 22.

The court next elected to apply the cross reference found in section 2K2.1(c)(1). That section provides in part:

> If the defendant [1] used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or [2] possessed or transferred a firearm or ammunition with

knowledge or intent that it would be used or possessed in connection with
another offense, apply --

. . . .

(B)     if death resulted, the most analogous offense guideline from [the
        Chapter 2A1 homicide guidelines], if the resulting offense level is
        greater than that determined [under section 2K2.1].

*Id.* § 2K2.1(c)(1).

The district court relied on the first clause of the cross reference and concluded

Mr. Fortier had used a firearm in connection with the commission of another offense.

Specifically, the court made the following conclusions.  First, Mr. Fortier's sale of the

firearms constituted a "use" of a firearm.  Second, the conspiracy to bomb the Murrah

Federal Building was the "other offense."  And third, the sale of the arms was "in

connection with" the bombing conspiracy because the proceeds of the sale facilitated or at

least had the potential to facilitate the bombing offense.  The court then concluded deaths

had resulted and that section 2A1.1, which governs first-degree murder, was the most

analogous offense guideline.  Application of 2A1.1 moved the offense level to 43.  *See*

*id.* § 2A1.1(a).

The district court then turned to adjustments under Chapter Three of the

Guidelines.  First, the court reduced Mr. Fortier's offense level by four because he had

played a minimal role in the conspiracy to bomb the Murrah Federal Building.  *See id.*

§ 3B1.2(a).  Second, the court increased the offense level by two because the defendant

had obstructed justice.  *See id.* § 3C1.1.  And third, it subtracted three offense levels

because Mr. Fortier had accepted responsibility. *See id.* § 3E1.1. Thus, after adjustments, but before any departures, Mr. Fortier's tentative total offense level was 38.

Next, the district court dealt with the subject of downward departures. On motion of the defendant, the court first departed downward three levels under section 2A1.1 n.1 because Mr. Fortier had not caused anyone's death intentionally or knowingly. *See id.* § 2A1.1 n.1 ("If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted."). Then, on motion of the government, the district court departed downward an additional two levels because of Mr. Fortier's substantial assistance in the prosecution of McVeigh and Nichols. *See id.* § 5K1.1. The court declined defendant's suggestion, however, to depart further based on his alleged extraordinary acceptance of responsibility. Application of the two downward departures resulted in a total offense level of 33, which, combined with Mr. Fortier's criminal history category of I, yielded a sentencing range of 135-168 months. *See id.* Ch. 5, Pt. A. Lastly, the district court addressed the matter of a fine. Under the Guidelines, the minimum and maximum amounts of a fine are generally tied to the defendant's total offense level. *See id.* §§ 5E1.2(b), (c). The district court based the defendant's fine on an offense level of 35, which was Mr. Fortier's total offense level *without* the two-level downward departure for substantial assistance. Under the fine table, that offense level indicated a fine range of $20,000 to $200,000. *See id.* § 5E1.2(c)(3).

The district court then sentenced Mr. Fortier to 144 months of imprisonment and three years of supervised release. The court also imposed a fine at the top of the permitted guideline range, ordering Mr. Fortier to immediately pay $200,000. Finally, the court ordered restitution in the amount of $4,100. This appeal ensued.

## II. Discussion

**A. Did the District Court Err When it Refused to Grant Mr. Fortier a Change of Venue for Sentencing?**

Mr. Fortier first contends the district court erred when it refused to grant him a change of venue for sentencing. Following his guilty plea, he moved to have the sentencing proceedings moved outside Oklahoma. He employed Fed. R. Crim. P. 21(b), which governs the transfer of *trial* from one district to another, to argue the "convenience of parties and witnesses" and "the interest of justice" militated towards moving his sentencing. The district court denied the motion on the merits. ***See United States v. Fortier***, 178 F.R.D. 578 (W.D. Okla. 1998).

We need not address whether to extend Rule 21 to a sentencing proceeding or the merits of Mr. Fortier's claim under that provision because he has waived his right to assert it. The defendant's plea agreement, which was accepted in its entirety by the district court, states that "Mr. Fortier agrees to waive *any* claim concerning venue and to waive any right to appeal except his right to appeal an unlawful sentence." ROA, Vol. I,

- 11 -

Doc. 4, ¶ 1 (emphasis added). Although the district court did not hold Mr. Fortier to this portion of the agreement, we elect to do so on appeal.

We will enforce a plea agreement unless the defendant agreed to its terms unknowingly or involuntarily, *see United States v. Atterberry*, 144 F.3d 1299, 1300 (10th Cir. 1998), or the agreement is otherwise unlawful, *see United States v. Libretti*, 38 F.3d 523, 529 (10th Cir. 1994), *aff'd*, 516 U.S. 29, 116 S. Ct. 356 (1995). Nothing in the plea colloquy suggests Mr. Fortier unknowingly or involuntarily agreed to this waiver. Moreover, nothing in the record would otherwise lead us to question the validity of the agreement. Therefore, Mr. Fortier has relinquished his right to raise this issue on appeal. In any event, we have reviewed the district court's decision for an abuse of discretion, *see United States v. Hunter*, 672 F.2d 815, 816 (10th Cir. 1982), and conclude its ruling stands on firm ground.

**B.     Did the District Court Err by Determining Mr. Fortier's Guideline Range Based on Statements He Made Pursuant to a Plea Agreement?**

Mr. Fortier next claims the district court erred at sentencing when it considered, in determining the applicable guideline range, information he had disclosed in the course of cooperating with the government. Considering that information, he argues, breached his plea agreement and violated section 1B1.8 of the Guidelines. We review *de novo* whether the government has violated the terms and conditions of a plea agreement. ***See United***

- 12 -

*States v. Brye*, 146 F.3d 1207, 1209 (10th Cir. 1998); *United States v. Hawley*, 93 F.3d 682, 690 (10th Cir. 1996). Mr. Fortier's claim is utterly without merit.

Section 1B1.8 governs the present dispute and provides:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, *except to the extent provided in the agreement*.

1994 U.S.S.G. § 1B1.8(a) (emphasis added). The language and spirit of section 1B1.8 require the agreement to specifically mention the court's ability to consider the defendant's disclosures in calculating the appropriate sentence range. *See United States v. Shorteeth*, 887 F.2d 253, 257 (10th Cir. 1989).

The plea agreement which Mr. Fortier and his counsel signed is unequivocal. Paragraph ten states in pertinent part:

> USE OF INFORMATION. Mr. Fortier understands that, *except in the circumstances described in this paragraph*, the United States will not use against him any statements he makes pursuant to this plea agreement in any criminal case . . . . Mr. Fortier agrees that . . . (d) *[s]tatements he makes and information he provides pursuant to this plea agreement may be used in the plea and sentencing proceedings on the charges* [to which he is pleading guilty].

ROA, Vol. I, Doc. 4, ¶ 10 (emphasis added). Mr. Fortier is bound by what he agreed to in paragraph ten. *See Atterberry*, 144 F.3d at 1300. We therefore reject his objection.

**C.    Did the District Court Err by Sentencing Mr. Fortier Under the Guideline for First-Degree Murder?**

Mr. Fortier's third complaint stems from the district court's decision to sentence him based on section 2A1.1, the guideline for first-degree murder. The 1994 Guidelines Manual Statutory Index[1] specifies that a district court must apply guideline 2K2.1 where the offense of conviction involves the transportation of stolen firearms. *See* 1994 U.S.S.G. App. A. Both parties agree the district court was correct to begin with section 2K2.1.[2] That section also contains a cross reference, however, and it is that cross reference that is the contentious issue on appeal. The provision states in part:

---

[1]The trial court applied the 1994 Guidelines Manual instead of the 1997 manual, even though the latter was in effect at the time of sentencing. The court was correct in doing so. As we noted in Nichols' appeal, the 1997 manual contains an adjustment that did not exist at the time of Mr. Fortier's offense conduct. *See United States v. Nichols*, 169 F.3d 1255, 1270 n.3 (10th Cir. 1999). Section 3A1.4 of the newer manual provides for a twelve-level increase where the offense is a "felony that involved, or was intended to promote, a federal crime of terrorism." 1997 U.S.S.G. § 3A1.4(a). Applying this provision to Mr. Fortier would implicate ex post facto concerns. *See United States v. Svacina*, 137 F.3d 1179, 1186 (10th Cir. 1998). Although we are not as confident as we were in *Nichols* that this guideline would apply to the defendant's conduct, we think it was appropriate for the district court, in an abundance of caution, to use the manual "in effect on the date that the offense of conviction was committed." 1997 U.S.S.G. § 1B1.11(b)(1).

[2]Mr. Fortier does not contest the district court's calculation of his sentence for making a false statement to the FBI or misprision of a felony. Instead, he focuses on the two firearm offenses because those charges carry a longer possible term of imprisonment and ultimately drive the district court's guideline calculations. *See* 1994 U.S.S.G. § 3D1.4 (stating in cases involving multiple counts that "[t]he combined offense level is determined by taking the offense level applicable to the Group with the highest offense level").

- 14 -

If the defendant [1] used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or [2] possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense, . . . [and] death resulted, [apply] the most analogous offense guideline from [the Chapter 2A1 homicide guidelines], if the resulting offense level is greater than that determined [under section 2K2.1].

*Id.* § 2K2.1(c)(1).

Mr. Fortier raises two issues with respect to this cross reference. He first contends it is not at all applicable to his case because he did not (1) use or possess any firearm in connection with the commission or attempted commission of another offense or (2) possess or transfer any firearm with knowledge or intent that it would be used or possessed in connection with another offense. He further argues that even if his sale of the weapons falls within the cross reference, the most analogous offense guideline in Chapter 2A1 would be section 2A1.4, the guideline for involuntary manslaughter, and not section 2A1.1, the guideline for first-degree murder.

Having perused the record, we find it unnecessary to address Mr. Fortier's first argument. For the sake of discussion, we simply assume he did use or possess the stolen firearms in connection with the commission or attempted commission of another offense. In the end, however, we agree with Mr. Fortier's alternative argument that the district court erred in applying the first-degree murder guideline.

A sentencing court's selection of the most analogous offense guideline involves an application of the potential guidelines to the facts. We therefore review the district

court's determination with due deference. *See* 18 U.S.C. § 3742(e) (Supp. II 1996); *United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir. 1999); *United States v. Doyan*, 909 F.2d 412, 414 (10th Cir. 1990). The deference that is due depends on the nature of the question presented. *See Koon v. United States*, 518 U.S. 81, 98, 116 S. Ct. 2035, 2046 (1996). Given the trial court's vantage on factual findings, we limit our review in that respect to searching for clear error. *See* 18 U.S.C. § 3742(e) (Supp. II 1996). Insofar as the defendant asks us to interpret the Guidelines, however, we conduct a *de novo* review. *See United States v. Checora*, --- F.3d ---, ---, 1999 WL 232031, at *3 (10th Cir. 1999). Moreover, the court's ultimate conclusion of which of several offense guidelines most appropriately applies to the facts as found is also a matter we review *de novo*. *See United States v. Voss*, 82 F.3d 1521, 1531 (10th Cir. 1996); *United States v. Norman*, 951 F.2d 1182, 1184 (10th Cir. 1991); *United States v. Roberts*, 898 F.2d 1465, 1469 (10th Cir. 1990).

In answering the particular questions presented, we are also bound, as was the district court, to look beyond the face of the indictment and consider the defendant's relevant conduct under section 1B1.3. Section 2K2.1(c)(1) is a cross reference, and 1B1.3(a) provides that cross references must be applied in light of a defendant's relevant conduct. *See* 1994 U.S.S.G. § 1B1.3(a); *United States v. Nichols*, 169 F.3d 1255, 1275 n.6 (10th Cir. 1999); *United States v. Tagore*, 158 F.3d 1124, 1128 (10th Cir. 1998).

Lastly, facts within the realm of relevant conduct must be proven by a preponderance of the evidence. *See United States v. Gomez-Arrellano*, 5 F.3d 464, 466 (10th Cir. 1993).

As we noted earlier, we have assumed that Mr. Fortier's sale of the weapons falls within the ambit of the cross reference. Therefore, we solely address the district court's selection of the most analogous guideline. Chapter 2A1 governs homicide offenses and provides us with the following options: 2A1.1, first-degree murder; 2A1.2, second-degree murder; 2A1.3, voluntary manslaughter; 2A1.4, involuntary manslaughter; and 2A1.5, conspiracy to commit murder. Mr. Fortier argues for section 2A1.4, while the government sides with the district court's application of section 2A1.1. The court selected the more serious guideline because it opined "the plain meaning of § 2K2.1(c)(1) suggests that the court can, and should, look to the nature of the crime that a defendant facilitated by transferring defendant's own intent." Because the other crime was a bombing which resulted in 168 deaths, the court felt it appropriate to attach the severe consequences of the first-degree murder guideline. As expected, Mr. Fortier disagrees with this conclusion.

In *United States v. Nichols*, 169 F.3d 1255 (10th Cir. 1999), a case not available to the trial court at sentencing, we discussed what is required for a sentencing court to permissibly select section 2A1.1 as the most analogous guideline. There, we remarked a court may in this context choose the first-degree murder guideline in only two circumstances: first, if evidence presented at trial or an evidentiary hearing demonstrates

by a preponderance of the evidence that the defendant harbored malice aforethought and premeditation,[3] *see id.* at 1272, 1275-76, or second, in the absence of such evidence, if the defendant's offense of conviction could serve as a predicate to the felony-murder rule found in 18 U.S.C. § 1111(a), *see id.* at 1272-75. Neither circumstance is present in this case.

There is no evidence in the record from which one can infer that it was more likely than not Mr. Fortier harbored malice and premeditation. First, the district court found, and both parties agree, Mr. Fortier did not harbor malice aforethought. Indeed, the government conceded three times at oral argument (with refreshing candor) that Mr. Fortier did not act with malice. To contend otherwise, the government noted, would require us to find the "government wrongly conceded the issue and the district court wrongly found the absence of malice." Second, the record on appeal admits of no prior design to commit murder. Premeditation in this context may not be presumed; there must be some evidence to support a finding the defendant did in fact premeditate and deliberate. Such evidence is not to be found in this record. Having no reason to question the district court's factual findings, or the government's concessions, we hold the first possible avenue to section 2A1.1 has been eliminated.

---

[3] In *Nichols*, we also suggested the district court could rely on allegations found in the indictment as a dispositive indicator of malice aforethought and premeditation. *See* 169 F.3d at 1271-72. Whether the face-of-the-indictment approach utilized in that case should likewise apply to Mr. Fortier is something we need not resolve. Mr. Fortier's indictment admits of no premeditation or malice aforethought of any kind.

We further conclude that not one of Mr. Fortier's offenses of conviction can serve as a predicate felony under the felony-murder rule. Under that rule, "[e]very murder . . . committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery . . . is murder in the first degree." 18 U.S.C. § 1111(a) (1994). In *Nichols* we announced a restrictive use of the doctrine at sentencing:

> [W]e note that courts are not bound by the constraints of section 1111(a) at sentencing. . . . [¶] [W]e nevertheless think it appropriate to work within the scope of that statute. The doctrine of felony murder expresses a highly artificial concept that generally deserves no extension . . . . In keeping with our desire not to unduly expand the doctrine, we hold our decision in the context of sentencing must be made with 18 U.S.C. § 1111(a) as a guide.

169 F.3d at 1272-73 (citations omitted).

The limitations found in that statute are poison to the government's position in this case. Mr. Fortier pleaded guilty to conspiring to transport stolen firearms, transporting stolen firearms, making a materially false statement to the FBI, and misprision of a felony. Not one of these offenses comes even close to the predicate felonies described in section 1111(a). *Cf. Nichols*, 169 F.3d at 1273-74 (conspiring to use an explosive weapon of mass destruction is the functional equivalent of attempted arson); *United States v. Gullett*, 75 F.3d 941, 949 (4th Cir. 1996) (maliciously damaging a building by means of explosives is equivalent to arson); *United States v. Prevatte*, 16 F.3d 767, 781-82 (7th Cir. 1994) (same). Therefore, the last possible door to section 2A1.1 is

unavailable. The district court should not have selected that guideline as the most analogous.

Before proceeding with an analysis of the remaining Chapter 2A1 guidelines, we address an argument which the government contends would permit the district court to apply section 2A1.1 in spite of the absence of malice aforethought and a proper predicate felony to felony murder. One of the application notes found in that guideline provides that the sentencing court may depart downward in cases where "the defendant did not cause the death intentionally or knowingly." 1994 U.S.S.G. § 2A1.1 n.1. This discretionary departure, the government argues, evinces the Sentencing Commission's view that district courts may apply section 2A1.1 as the most analogous offense guideline even in cases such as the one presented here. The potential unfairness of attaching the severe consequence of the first-degree murder guideline to someone like Mr. Fortier, the argument goes, is simply addressed via a 2A1.1 n.1 downward departure. Indeed, the government reminds us, Mr. Fortier did in fact receive such beneficence in the form of a three-level downward departure.

We reject that approach. The government's argument reverses the conveyance and the steed. The discretionary departure found in the commentary to 2A1.1 is accessible only when guideline 2A1.1 has *already* been properly selected. Furthermore, and more specifically, the departure is available *only* when the court selects guideline 2A1.1 via the felony-murder rule, whether because the defendant was convicted of felony murder or

because the court utilized the felony-murder rule at sentencing in the manner described here and in *Nichols*. The application note, which we reproduce in its entirety, makes this abundantly clear:

> The Commission has concluded that in the absence of capital punishment life imprisonment is the appropriate punishment for [first-degree murder]. However, this guideline also applies when death results from the commission of certain felonies. Life imprisonment is not necessarily appropriate in all such situations. For example, if in robbing a bank, the defendant merely passed a note to the teller, as a result of which she had a heart attack and died, a sentence of life imprisonment clearly would not be appropriate.
>
> If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. The extent of the departure should be based upon the defendant's state of mind (*e.g.*, recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is likely to be appropriate. Also, because death obviously is an aggravating factor, it necessarily would be inappropriate to impose a sentence at a level below that which the guideline for the underlying offense requires in the absence of death.

*Id.* § 2A1.1 n.1.

As is evident, the entire application note is structured with the felony-murder rule in mind. First, it incorporates the rule by stating that the first-degree murder guideline also applies when death results from the commission of certain felonies. **See Nichols**, 169 F.3d at 1272 (stating section 2A1.1 incorporates the felony-murder rule). Second, the Commission opines that life imprisonment is not necessarily appropriate where felony murder is involved. This makes sense. In such a case, the death of the victim is often an accident stemming from the defendant's commission of another dangerous felony. To

mitigate the harshness of applying a base offense level of 43 in such a case, and to distinguish the defendant from another who intended to kill the victim, the Guidelines encourage a downward departure. Third, the application note refers to a defendant's negligent state of mind, something out of place in a malice murder case. And fourth, the note speaks twice of considering the "underlying offense," a reference, in our judgment, to the underlying predicate felony to felony murder.

The note's language leads to the ineluctable conclusion the discretionary departure only applies when a court selects section 2A1.1 by means of the felony-murder rule. *Accord United States v. Tocco*, 135 F.3d 116, 131 (2d Cir.), *cert. denied*, --- U.S. ---, 118 S. Ct. 1581 (1998); *Gullett*, 75 F.3d at 949; *United States v. Prevatte*, 66 F.3d 840, 844 (7th Cir. 1995); *Prevatte*, 16 F.3d at 784-85; *United States v. El-Zoubi*, 993 F.2d 442, 450 (5th Cir. 1993). It therefore follows section 2A1.1 n.1 may not be used, as the government suggests, as an excuse to apply the first-degree murder guideline in a case where there is no malice aforethought *and* no proper predicate felony to felony murder. In rejecting the government's argument, we further note our holding on this point has the effect of invalidating the three-level downward departure Mr. Fortier received under 2A1.1 n.1.

The next two potential guidelines we discuss are section 2A1.2, the guideline for second-degree murder, and section 2A1.5, the guideline for conspiracy to commit murder. Neither applies here. Like their more serious counterpart of first-degree murder, both

second-degree murder and conspiracy to commit murder require malice aforethought. *See United States v. Kelly*, 1 F.3d 1137, 1140 n.2 (10th Cir. 1993) (discussing second-degree murder); *Branch*, 91 F.3d at 732 (discussing conspiracy to commit murder); *United States v. Croft*, 124 F.3d 1109, 1121-22 (9th Cir. 1997) (same). It therefore follows that before selecting either 2A1.2 or 2A1.5, we must require, at a minimum, that evidence of malice aforethought preponderate. *Accord United States v. Walls*, 80 F.3d 238, 242 (7th Cir. 1996) (discussing section 2A1.2). *But see United States v. Pearson*, 159 F.3d 480, 486 (10th Cir. 1998) (suggesting the existence of a second-degree felony-murder rule). Being that such malice is nowhere to be found in this case, we must eliminate these guidelines as possible options.

The two remaining guidelines in Chapter 2A1 are the manslaughter guidelines: voluntary manslaughter, *see* 1994 U.S.S.G. § 2A1.3, and involuntary manslaughter, *see id.* § 2A1.4. Voluntary manslaughter is inapposite because neither the victims' deaths nor the defendant's actions evolved from a sudden quarrel or in the heat of passion. *See* 18 U.S.C. § 1112(a) (1994) (defining voluntary manslaughter as the unjustified and unexcused "killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion"); Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 7.10, at 653 (2d ed. 1986) ("Voluntary manslaughter . . . consists of an intentional homicide committed under extenuating circumstances . . . [such as where] the defendant . . . was in a state of passion engendered in him by an adequate provocation . . . ."). The Oklahoma City

tragedy resulted from an ambitious and elaborate scheme, developed over at least seven months, to detonate a 3000-6000 pound truck bomb in front of the Murrah Federal Building.  *See Nichols*, 169 F.3d at 1276; *McVeigh*, 153 F.3d at 1198.  Furthermore, Mr. Fortier's acts of transporting and selling stolen firearms did not even remotely stem from any reasonably induced provocation.  Quite simply, the facts of this case resemble nothing of an ordinary voluntary manslaughter prosecution.  *Cf. Checora*, --- F.3d at ---, 1999 WL 232031, at *7 (listing and describing typical voluntary manslaughter cases).  Therefore, section 2A1.3 is not an option.

By the process of elimination we are left with the guideline on involuntary manslaughter.  To be sure, that offense's liability statute is not a perfect fit.  Involuntary manslaughter is the unjustified and unexcused killing of a human being without malice "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."  18 U.S.C. § 1112(a) (1994).  Unlawful-act involuntary manslaughter is limited to those situations where the killing of a human being resulted from the commission of an unlawful act *not amounting to a felony*.  Lawful-act liability attaches only when one commits a *lawful act* in an unlawful manner or without due caution or circumspection.  Mr. Fortier's offense conduct falls under neither.  Transporting and selling stolen firearms amounts to an *unlawful act constituting a felony*.  *See* 18 U.S.C. §§ 922(i), (j), 924(a)(2), 3559(a)(3) (1994).  Therefore, under the literal

terms of the statute, we cannot analogize Mr. Fortier's conduct to involuntary

manslaughter. *Accord Pearson*, 159 F.3d at 486 (stating that the "accidental discharge of

the gun in the commission of the robbery . . . does not constitute involuntary

manslaughter under § 1112 because robbery is an unlawful act that is a felony"); *United*

*States v. Hatatley*, 130 F.3d 1399, 1403-04 (10th Cir. 1997) (affirming denial of request

for involuntary manslaughter instruction where defendant's conduct constituted the felony

of aggravated assault); *United States v. Comosona*, 848 F.2d 1110, 1115 (10th Cir. 1988)

(affirming denial of request for involuntary manslaughter instruction where defendant

threw knife at victim because that act was a felony).

Nevertheless, as we noted in *Nichols*, courts are not bound at sentencing by the

terms of a criminal liability statute. *See* 169 F.3d at 1272-73 (discussing the felony-

murder statute); *see also* 1994 U.S.S.G. § 1B1.3 n.1 ("The principles and limits of

sentencing accountability under [relevant conduct] are not always the same as the

principles and limits of criminal liability."). The Guidelines require that the sentencing

court apply the most analogous offense guideline, not the most analogous offense statute.

Furthermore, in finding the *most analogous* guideline, "a perfect match is not required."

*Nichols*, 169 F.3d at 1271 (quoting *United States v. Terry*, 86 F.3d 353, 358 (4th Cir.

1996)).

Our understanding of involuntary manslaughter, as that homicide is defined by

commentary to section 2A1.4, leads us to conclude that 2A1.4 is most analogous to Mr.

- 25 -

Fortier's offense conduct. The Guidelines' commentary, "which functions to interpret a guideline or explain how it is to be applied[,] controls" here. ***Stinson v. United States***, 508 U.S. 36, 42, 113 S. Ct. 1913, 1917-18 (1993) (internal quotation marks and citations omitted). Notably, the Guidelines do not define first-degree murder, second-degree murder, conspiracy to commit murder, or voluntary manslaughter. ***See*** 1994 U.S.S.G. §§ 2A1.1, 2A1.2, 2A1.3, 2A1.5. Had the Commission provided such guidance, as it did with section 2A1.4, we would have been obliged to consider as much in assessing the issue presented to us today.

The commentary explains that section 2A1.4 governs two forms of offense conduct: conduct that is criminally negligent and conduct that is reckless. ***See*** 1994 U.S.S.G. § 2A1.4(a)(1)-(2). The former provides for a base offense level of 10, the latter, one of 14. ***See id.*** The application notes define "criminally negligent" as "conduct that involves a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, but which is not reckless," ***id.*** § 2A1.4 n.2, and "reckless" as where "the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation," ***id.*** § 2A1.4 n.1.

Mr. Fortier admits his conduct was tantamount to criminally negligent involuntary manslaughter. He should have known his sale of the firearms had the capacity to further the bombing of the Murrah Federal Building (an offense he knew for certain would result in many deaths). A colorable argument may be made, however, given the facts proven in this case, that his conduct bordered on recklessness. There is evidence in the record from which one could infer Mr. Fortier was actually aware of the risk but chose instead to disregard it. Nonetheless, we need not decide whether Mr. Fortier's conduct was more akin to criminal negligence or recklessness. Neither attendant offense level is greater than the district court's offense level computation under section 2K2.1.

The cross reference provides that the most analogous offense guideline under Chapter 2A1 must be applied only if "the resulting offense level is greater than that determined" under the base offense level and specific offense characteristics found in section 2K2.1. 1994 U.S.S.G. § 2K2.1(c)(1)(B). Before applying the cross reference, the district court had concluded that Mr. Fortier's offense level under section 2K2.1 was 22. Because that number is greater than the two possible base offense levels found under section 2A1.4, the cross reference cancels itself out.

All things considered, the district court should not have applied the first-degree murder guideline. We have performed the necessary review and are convinced that among the Chapter 2A1 guidelines, the guideline for involuntary manslaughter (although not a perfect fit) was the most analogous. And because the base offense levels found in

that guideline are not greater than the 22 determined under section 2K2.1, the district court should have begun with an offense level of 22, before any adjustment and departures, rather than the significantly higher offense level associated with the first-degree murder guideline. We do not fault the court for ruling as it did; our decision in *Nichols*, which drives our disposition here, was published after the district court imposed the defendant's sentence.

**D.      Did the District Court Abuse its Discretion When it Departed Downward Only Two Levels for Substantial Assistance?**

Mr. Fortier also argues the district court abused its discretion when it chose to depart downward only two levels for substantial assistance. *See* 1994 U.S.S.G. § 5K1.1. The limited departure, he contends, belittles the true nature and extent of his assistance in the prosecution of McVeigh and Nichols.

We sympathize with Mr. Fortier's argument but must disregard this challenge because we have no jurisdiction to entertain it. It is well established that appellate courts lack jurisdiction to review, at the urging of a defendant, the extent of a downward departure. *See United States v. McHenry*, 968 F.2d 1047, 1049 (10th Cir. 1992); *United States v. Bromberg*, 933 F.2d 895, 896-97 (10th Cir. 1991). The statute which governs appellate review of sentences affords no relief to a party who complains the sentencing court's deviation from the Guidelines should have been greater. *See* 18 U.S.C. § 3742(a)

(Supp. II 1996); ***United States v. Pighetti***, 898 F.2d 3, 4 (1st Cir. 1990).  Therefore, we dismiss this portion of the appeal.

**E.      Did the District Court Abuse its Discretion When it Refused to Depart Downward Based on Extraordinary Acceptance of Responsibility?**

Mr. Fortier next posits the district court abused its discretion when it refused to further depart downward based on his extraordinary acceptance of responsibility.  He contends his "extraordinary efforts over three years to aid in the bombing prosecutions" were a mitigating circumstance of a kind and a degree not adequately taken into account by the Sentencing Commission.  ***See*** 1994 U.S.S.G. § 5K2.0.  Separate consideration was deserved, he contends, beyond the government's substantial assistance motion.  The district court declined to depart, stating:  "Defendant's request for an additional downward departure [for extraordinary cooperation] is denied.  This is a matter to be addressed at sentencing in connection with the government's announced plan to file a § 5K1.1 motion."  Mr. Fortier disagrees with that assessment.

The defendant's contention fails at the outset because it is beyond our purview. Once again, we impart what we had thought (and hoped) was already known to criminal attorneys in this circuit and every other.  Courts of appeals cannot exercise jurisdiction to review a sentencing court's refusal to depart from the Guidelines, either upward or downward, unless the court refused to depart because it interpreted the Guidelines to deprive it of the authority to do so.  The rule has been stated countless times.  ***See, e.g.,***

*United States v. Castillo*, 140 F.3d 874, 888 (10th Cir. 1998); *United States v. Banta*, 127 F.3d 982, 983 n.1 (10th Cir. 1997); *United States v. Belt*, 89 F.3d 710, 714 (10th Cir. 1996); *United States v. Nelson*, 54 F.3d 1540, 1544 (10th Cir. 1995); *United States v. Rodriguez*, 30 F.3d 1318, 1319 (10th Cir. 1994); *United States v. Holsey*, 995 F.2d 960, 963 (10th Cir. 1993); *United States v. Hollis*, 971 F.2d 1441, 1461 n.13 (10th Cir. 1992); *United States v. Munoz*, 946 F.2d 729, 730 (10th Cir. 1991); *United States v. Soto*, 918 F.2d 882, 883 (10th Cir. 1990).

Equally clear in our circuit, and most pertinent to Mr. Fortier's challenge, is that we treat ambiguous statements made by district judges as though the judge was aware of his or her legal authority to depart but chose instead, in an exercise of discretion, not to depart. *See, e.g., Castillo*, 140 F.3d at 887; *United States v. Coddington*, 118 F.3d 1439, 1441 (10th Cir. 1997); *United States v. Segien*, 114 F.3d 1014, 1024 (10th Cir. 1997), *cert. denied*, --- U.S. ---, 118 S. Ct. 1310 (1998); *Belt*, 89 F.3d at 714; *United States v. Rowen*, 73 F.3d 1061, 1063 (10th Cir. 1996); *Nelson*, 54 F.3d at 1544; *United States v. Stewart*, 37 F.3d 1449, 1450 (10th Cir. 1994); *Rodriguez*, 30 F.3d at 1319; *United States v. Barrera-Barron*, 996 F.2d 244, 245-46 (10th Cir. 1993). As we stated six years ago:

> [W]e no longer are willing to assume that a judge's ambiguous language means that the judge erroneously concluded that he or she lacked authority to downward depart. . . . Accordingly, unless the judge's language unambiguously states the judge does not believe he has authority to downward depart, we will not review his decision.

*Rodriguez*, 30 F.3d at 1319.

We have studied the sentencing transcript in this case and, in light of the principles stated above, conclude the district court made a discretionary decision not to depart, not a legal decision that it had no authority to depart.  We therefore dismiss this frivolous portion of Mr. Fortier's appeal.

**F.      Did the District Court Err When it Imposed a $200,000 Fine?**

In his final claim of error, Mr. Fortier argues the district court erred when it imposed a fine of $200,000.  The court supported its decision by stating: "Given the facts and circumstances surrounding this highly publicized crime, defendant might become able to pay a fine in the future and the defendant is not to profit from his crime.  That is my finding about the fine."  Mr. Fortier questions two aspects of the court's order.  First, he claims the district court erred when it set the fine range based on his total offense level as calculated *without* the two-level downward departure for substantial assistance.  Second, Mr. Fortier contends the district court made inadequate findings regarding his ability to pay a fine of $200,000.

These claims have been mooted by our holding that the district court's calculation of the total offense level was in error.  The Guidelines provide for different fine ranges depending on the defendant's total offense level.  *See* 1994 U.S.S.G. §§ 5E1.2(b), (c).  The district court based its initial calculations on an offense level of 43, the figure associated with the first-degree murder guideline.  Our decision today, however, requires

the court to begin with a significantly lower number. We expect our holding will dramatically affect Mr. Fortier's total offense level. Therefore, we vacate the fine imposed in this case and remand for further proceedings.

## III. Conclusion

Because the district court erred in applying the first-degree murder guideline to Mr. Fortier's offense conduct, we **VACATE** his sentence and remand for resentencing in a manner consistent with this opinion. We **DISMISS** the portions of the appeal wherein the defendant complains of the extent and character of his downward departures.