**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 13, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CEDRIC JAMARA CHERRY,

Defendant - Appellant.

No. 08-7090

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 6:08-CR-00008-JHP-1)**

---

Robert Ridenour, Assistant Federal Public Defender, (Julia L. O'Connell, Federal Public Defender; Barry L. Derryberry, Research & Writing Specialist, with him on the briefs), Office of Federal Public Defender, Eastern District of Oklahoma, Tulsa, Oklahoma, for Defendant - Appellant

Robert Wallace, Assistant United States Attorney, (Sheldon J. Sperling, United States Attorney, with him on the brief), Muskogee, Oklahoma, for Plaintiff - Appellee.

---

Before **KELLY**, **BRISCOE**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Cedric Cherry was indicted in the United States District Court for the

Eastern District of Oklahoma for being a felon in possession of a firearm. *See*

18 U.S.C. § 922(g)(1). The charge resulted from an investigation into a gun fight that left one participant dead. Mr. Cherry pleaded guilty and the district court sentenced him to a 94-month term of incarceration. In calculating Mr. Cherry's sentencing range under the United States Sentencing Guidelines, the court applied USSG §§ 2K2.1(c)(1)(B) and 2A1.3 to set his offense level as if he had committed voluntary manslaughter. Mr. Cherry appeals, contending that the offense-level calculation was incorrect because there was no proof that he fired the fatal bullet. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.    BACKGROUND

The gun fight occurred on April 27, 2007, in Idabel, Oklahoma. The victim was Chris Moore. Earlier that day, Moore had made threatening gestures (displaying gang signs and a red bandana) in a confrontation with two of Mr. Cherry's cousins. In the evening the same cousins, accompanied by Mr. Cherry's brother and some other associates, again encountered Moore in the Hillcrest area of Idabel. After a few remarks from Moore and his companions, Mr. Cherry's cousin phoned him to report that Moore and others were giving them trouble. Mr. Cherry drove to Hillcrest. When he arrived, he stopped his car in the middle of the road, jumped out with a gun in his hand, and cocked the gun. He exchanged words with Moore's group, threatening to kill them. Gunfire broke out. Several persons on both sides, including Mr. Cherry and Moore, fired shots. Law-enforcement officers called to the scene found Moore on the ground and he

-2-

was later pronounced dead. No bullet was recovered from his body. Who fired the fatal round is thus an open question.

Mr. Cherry, who had a prior felony conviction for methamphetamine possession, was charged with being a felon in possession of a firearm, and he pleaded guilty. The probation office prepared a presentence report (PSR) that calculated Mr. Cherry's base offense level using USSG § 2K2.1, the guideline for violations of 18 U.S.C. § 922(g). The guideline contains a cross-reference providing that the offense level for homicide may be applicable. It states:

> If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense . . . apply—
> . . .
>
> (B) if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined [under the preceding provisions of § 2K2.1].

USSG § 2K2.1(c)(1). Although the PSR noted that Mr. Cherry had been charged in Oklahoma state court with second-degree murder stemming from the April 27 gun fight, it selected a lesser offense, voluntary manslaughter, as the most analogous. Therefore it applied the voluntary-manslaughter guideline, USSG § 2A1.3, which set Mr. Cherry's base offense level at 29. The PSR then subtracted three points for Mr. Cherry's acceptance of responsibility, resulting in a total offense level of 26. (As required for the cross reference to apply, this total

exceeded the adjusted offense level of 15 that the PSR had calculated under the other provisions of § 2K2.1.)

The district court held an evidentiary hearing at which both Mr. Cherry and the government presented witnesses concerning the events of April 27. At sentencing, the court ruled that Mr. Cherry's conduct in connection with his possession of a firearm was a but-for cause of Moore's death. The court agreed with the PSR that it was appropriate to apply the guideline for voluntary manslaughter. It noted that 18 U.S.C. § 1112 "defines manslaughter as the unlawful killing of a human being without malice" and found that "Mr. Cherry's actions appear[ed] to have been made with spontaneity in the heat of passion." It rejected application of the *in*voluntary-manslaughter guideline, saying that Mr. Cherry's "action further appears to have been acted out with design and intention, and would not amount to an involuntary act." R. Vol. II Doc. 52 at 4. With a criminal-history category of IV, Mr. Cherry had a guideline range of 92 to 115 months, and the court imposed a 94-month sentence.

## II. DISCUSSION

When considering a district court's application of the guidelines, "we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir. 2006) (internal quotation marks omitted). We review de novo whether the facts found by the

court support the application of the guideline it selected. *See United States v. Fortier*, 180 F.3d 1217, 1225 (10th Cir. 1999).

In applying the § 2K2.1(c)(1) cross reference to the homicide guidelines in § 2A1, the court may look to the federal homicide statutes that correspond to the various § 2A1 guidelines. *See*, *e.g.*, *id.* at 1228 (rejecting application of voluntary-manslaughter guideline as most analogous after referencing elements of 18 U.S.C. § 1112(a)); *see also United States v. Nichols*, 169 F.3d 1255, 1273 (10th Cir. 1999). The court, however, is "not bound at sentencing by the terms of a criminal liability statute" and "a perfect match is not required" between the defendant's conduct and the homicide guideline selected as the most analogous. *Fortier*, 180 F.3d at 1229 (internal quotation marks omitted).

The federal voluntary-manslaughter statute, 18 U.S.C. § 1112(a), defines the offense as "the unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion." Mr. Cherry's sole argument against application of the voluntary-manslaughter guideline, USSG § 2A1.3, is that there was no proof that he fired the fatal shot. We are not persuaded. To begin with, we doubt that such proof is necessary to establish the offense. Although we are aware of no federal case in point, it appears that criminal liability for homicide does not turn on proof that the defendant was the actual instrument of the death. In *People v. Kemp*, 310 P.2d 680 (Cal. App. 1957), Kemp and a codefendant had been racing on a residential street when the codefendant's vehicle struck a third

car, killing a passenger. The court affirmed Kemp's conviction of manslaughter, explaining:

> Kemp and [the codefendant] were inciting and encouraging one another to drive at a fast and reckless rate of speed on a residence street and as they closely approached a blind intersection. It was by the merest chance that Kemp was able to avoid hitting the other car, and that Coffin was not. Only the matter of a split second and a few inches made the difference. . . . [T]he acts of both led directly to and were a proximate cause of the result, and the fact that the appellant happened to narrowly escape the actual collision is not the controlling element. The evidence is sufficient to show that they were not acting independently of each other, and that they were jointly engaged in a series of acts which led directly to the collision. The language of [California's manslaughter statute] is broad enough to impose criminal liability in this situation . . . .

*Id.* at 683; *see People v. Sanchez*, 29 P.3d 209, 216–18 (Cal. 2001) (discussing *Kemp* with approval and affirming first-degree murder conviction of defendant who had engaged in gun battle even though evidence did not show which participant's gun had fired shot killing innocent bystander); *Commonwealth v. Gaynor*, 648 A.2d 295 (Pa. 1994) (duel participant guilty of first-degree murder of bystander despite other participant's firing fatal shot).

Moreover, even if the federal offense of voluntary manslaughter did not encompass Mr. Cherry's conduct, we still think it was a proper analogy for purposes of the sentencing guidelines. (In our view, the district court may have been lenient in not analogizing Mr. Cherry's conduct to a more serious form of homicide.) The district court found that Mr. Cherry precipitated the gun battle

-6-

that led to Moore's death and that he had the requisite intent for voluntary manslaughter. It was only fortuitous if his shot was not the one that killed Moore.

## III. CONCLUSION

We AFFIRM the judgment of the district court.