**UNITED STATES of America, Plaintiff–Appellant,**

v.

**José P. MOLINA, Defendant–Appellee.**

No. 877, Dockets 96–1260(L), 96–1308(XAP).

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1996.

Decided Feb. 12, 1997.

Lawrence Mark Stern, New York City, for defendant–appellee.

Paul Weinstein, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., David C. James, Asst. U.S. Atty., on the brief), for plaintiff–appellant.

Before: NEWMAN, Chief Judge, OAKES and WINTER, Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal primarily concerns a narrow sentencing issue relating to enhanced punishment for injury to a bystander. The precise issue is whether a specific offense enhancement based on bodily injury to a victim, sustained during the commission of a robbery, may be imposed when the bullet that struck the victim did not come from the weapon of the defendant or his co-conspirators, but from that of an armed guard attempting to fend off the robbery. The question arises on an appeal by the United States from the April 18, 1996, judgment of the District Court for the Eastern District of New York (Jack B. Weinstein, Judge), sentencing defendant José P. Molina to a term of imprisonment of 78 months, following a jury verdict convicting him of conspiracy to

commit robbery in violation of 18 U.S.C. § 1951(a). We conclude that the District Judge erred in holding that, as a matter of law, the specific offense enhancement of U.S.S.G. § 2B3.1(b)(3) cannot be applied when the bullet that injured the victim did not come from the weapon of the defendant or his co-conspirators. We also conclude that the District Judge's finding, for the purpose of the specific offense enhancement of U.S.S.G. § 2B3.1(b)(2), that it was not reasonably foreseeable to the defendant that his co-conspirators would discharge their weapons during the robbery attempt was clearly erroneous. We vacate Molina's sentence and remand for resentencing.

## Background

Molina and his co-conspirators, Santiago, Serrano, and Castro, were long-time acquaintances who began, in late 1991 or early 1992, to plan the robbery of an armored car that regularly delivered cash to a check-cashing store near Molina's residence in Brooklyn. After a series of meetings, the conspirators agreed that Santiago and Serrano would be the gunmen, Molina would drive the first getaway car, and Castro would supply the required firearms and drive the second getaway car.

On the morning of the day of the robbery, Santiago and Serrano walked to Molina's house. Molina was carrying a black bag when he left his residence. When the three men met with Castro later that morning, Castro said that he was busy and could not participate in the robbery. Undeterred, Serrano, Santiago, and Molina entered a stolen car that Molina had obtained for the robbery and proceeded with their plan. Molina drove the vehicle.

As the car approached the check-cashing store, Santiago removed two weapons from the black bag that Molina had carried earlier—a machine gun with a full magazine of ammunition and a semi-automatic pistol, also fully loaded. When the conspirators arrived at the check-cashing store, they noticed that all the available parking spaces in front of the store were occupied. Molina decided to double-park the getaway vehicle while the conspirators awaited the arrival of the armored car.

Santiago decided to walk into a nearby grocery store; Serrano and Molina remained in front of the check-cashing store. While Santiago was still in the grocery store, a woman whose car was blocked by the double-parked getaway vehicle insisted that Molina move his vehicle so that she could drive away. Molina obliged, reentered the getaway vehicle, moved it to let the woman's car drive off, and began to circle the block in order to return to the same spot in front of the check-cashing store.

Just as Molina left the scene, the armored car arrived and double-parked about where the getaway car had earlier been parked. One armed guard got out and removed two bags, one with cash and the other with food-stamps. A second armed guard got out and stood nearby. The first guard then began to carry the two bags toward the check-cashing store.

Santiago, who apparently did not see Molina move the getaway car, left the nearby grocery store, drew his machine gun, and confronted the guards. The first guard dropped the bags and ducked behind a car. Santiago fired a volley of bullets that missed both guards and slammed into the armored vehicle. The second guard drew his weapon and fired at Santiago, striking him repeatedly. The first guard also began firing at Santiago, who fell and dropped his machine gun.

During the shooting, Serrano, who had seen Molina move the car, yelled for Santiago to run. Upon seeing that Santiago had been shot and that Molina and the getaway vehicle were nowhere in sight, Serrano fired his weapon in the direction of the armored car and fled from the scene. He eventually ran to Molina's residence, a few blocks away, and found Molina already there.

After the shooting, it was discovered that a 79–year–old woman who was at the scene of the crime had been struck in the foot by a stray bullet. After the bullet was surgically removed, forensic analysis revealed that it had likely come from the weapon of one of the guards.

The conspirators were eventually apprehended and charged with various offenses arising from the attempted robbery. Santiago and Serrano entered guilty pleas; Castro and Molina proceeded to trial. Castro was eventually acquitted of all charges against him. Molina was convicted of conspiring to commit a robbery affecting interstate commerce in violation of 18 U.S.C. § 1951(a). He was sentenced to a prison term of 78 months. The Government appeals Molina's sentence pursuant to 18 U.S.C. § 3742(b).

### Discussion

#### I. Enhancement for Discharge of Firearm

Under the Guidelines provision for robbery offenses, the base offense level is increased when a firearm is used during a robbery. U.S.S.G. § 2B3.1(b)(2). The amount of the enhancement depends on the manner in which the weapon is used:

(A) If a firearm was discharged, increase by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished, displayed, or possessed, increase by 5 levels. : . . .

*Id.* § 2B3.1(b)(2)(A)-(C).[1] It is undisputed that Serrano and Santiago discharged their firearms during the robbery attempt. The District Court nonetheless declined to impose a seven-level enhancement on Molina's base offense level. Instead, the Court imposed only a five-level enhancement based on the co-conspirators' "brandish[ing], display[ ], or possess[ion]" of their firearms, because it found that Serrano and Santiago's *discharge* of their weapons was an event not reasonably foreseeable by Molina.

■■■ On this sentencing appeal, we must "accept the findings of fact of the district court unless they are clearly erroneous and . . . give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). This Circuit has held that "[i]ncluded within the 'clearly erroneous' rubric is the question of reasonable foreseeability." *United States v. Ekwunoh*, 12 F.3d 368, 370 (2d Cir.1993); *see United States v. Brumby*, 23 F.3d 47, 50 (2d Cir.1994). *But*

*see Ekwunoh*, 12 F.3d at 373 (Newman, J., concurring) (arguing that reasonable foreseeability is legal issue "fully available for *de novo* review"). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quotations and citation omitted). Upon reviewing the "entire evidence" in this case, we are "left with the definite and firm conviction" that the District Court erred in finding that Molina could not have reasonably foreseen that Serrano and Santiago would discharge their weapons during the commission of a robbery of an armored car.

■■■ Under the relevant conduct principles of subsection 1B1.3(a)(1)(B), all "reasonably foreseeable acts and omissions of others" in furtherance of the conspiracy may be taken into account to determine a defendant's sentence. *See United States v. Medina*, 74 F.3d 413, 415 (2d Cir.1996). Therefore, Molina's sentence can be enhanced under subsection 2B3.1(b)(2)(A), based on Serrano's and Santiago's discharge of their firearms, if "(1) the [discharge] was committed in furtherance of the conspiracy, and (2) the [discharge] was reasonably foreseeable [to Molina]." *Brumby*, 23 F.3d at 50. Because there is no dispute that the weapons were fired to further the aims of the conspiracy, the only question is whether their discharge was reasonably foreseeable to Molina.

The District Court credited Molina's contention that the conspirators' intended plan was not to fire their weapons during the robbery. Implicitly finding that the weapons were discharged only because the original plan went awry when Molina decided to move the double-parked getaway vehicle, the District Court concluded that only a five-level enhancement under subsection 2B3.1(b)(2)(C) was appropriate because "it's not foreseeable that the people [he] associated [with would] act[ ] stupidly" and discharge their firearms.

---

**1.** The remainder of this subsection concerns the use of a "dangerous weapon" and the making of

"an express threat of death," subsections that are not at issue in this case.

The District Court also found, however, that Molina knew "that there was a machine gun supplied for the robbery and one of the co-conspirators was carrying that machine gun and it was loaded and that the co-conspirator was prepared to fire it." Indeed, the Court acknowledged that the conspirators knew that they were "up against people carrying sidearms" and that "given the circumstances of the type of people going in with loaded guns one of them could be fired." Although Molina was unarmed and was not present at the scene when the shots were fired, he willingly participated in a conspiracy to rob an armored car guarded by armed men, and he supplied his co-conspirators with a fully loaded machine gun and a semi-automatic pistol. As the District Court itself noted, "it was understood [between the conspirators] that the guards would be armed and an exchange of fire was therefore probable."

On the "entire evidence" presented in this case, we are "left with the definite and firm conviction" that the District Court erred in finding that Molina could not have reasonably foreseen that Serrano and Santiago would discharge their firearms during the commission of the crime. Even if Molina hoped that the original plan would be carried out and that no shooting would occur, it was nonetheless reasonable for him to foresee that, in an encounter between armed robbers and armed guards protecting an armored car, a shooting was likely to occur.

## II. Enhancement for Bodily Injury to Victim

Under another specific offense enhancement provision governing robbery offenses, the sentencing court is required to "increase the offense level according to the seriousness of the injury" if "any victim sustained bodily injury." U.S.S.G. § 2B3.1(b)(3). Specifically, the sentencing court must increase the defendant's base offense level by two if any victim sustained "bodily injury," *id.* § 2B3.1(b)(3)(A), by four if any victim sustained "serious bodily injury," *id.* § 2B3.1(b)(3)(B), and by six if any victim sustained "permanent or life-threatening bodily injury," *id.* § 2B3.1(b)(3)(C).

The parties do not dispute that a bystander at the scene of the crime sustained a "serious bodily injury" within the meaning of subsection 2B3.1(b)(3)(B) when a stray bullet struck her during the exchange of fire between the conspirators and the guards. *See id.* § 1B1.1 comment. (n.1(j)) (" 'Serious bodily injury' means injury involving extreme physical pain ... or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."). The parties also do not dispute that bystanders constitute "victims" within the meaning of this specific offense enhancement. *See United States v. Muhammad,* 948 F.2d 1449, 1456 (6th Cir. 1991) ("[T]he language 'any victim' in § 2B3.1(b)(3) was meant to include any employee, bystander, customer, or police officer who gets assaulted during the bank robbery or during an attempted get-away."). The only issue, therefore, is whether this enhancement applies when the bullet that caused the victim's injury did not come from the weapon of either Serrano or Santiago, but from one of the guards. This legal question is subject to *de novo* review, *see United States v. Hernandez–Santiago,* 92 F.3d 97, 100 (2d Cir.1996), and we conclude that the District Court erred in ruling that, as a matter of law, the bodily injury enhancement of subsection 2B3.1(b)(3) cannot be applied to increase a defendant's sentence under such circumstances.

The District Court relied expressly on *United States v. Gordon,* 64 F.3d 281 (7th Cir.1995), in which the Seventh Circuit held that an enhancement based on subsection 2B3.1(b)(2)(A) for discharging a firearm could be imposed only if the person who discharged the weapon was the defendant or one of his co-conspirators. In that case, the defendant, while attempting to rob a bank, used a metal pipe as a fake gun. When a security guard grabbed the defendant from behind, pointed his firearm at him, and told him not to move or he would be shot, the defendant continued to struggle with the guard, and the guard discharged his weapon at the defendant. The sentencing court reasoned that subsection 2B3.1(b)(2)(A) was applicable and increased the defendant's base offense level by seven because the guard's

firearm was "discharged as a proximate result" of the defendant's conduct of struggling with the guard. *Id.* at 283. The Seventh Circuit reversed, rejecting the Government's theory that the enhancement could be applied because the defendant had "induced ... or willfully caused" the guard to discharge his gun, *see* U.S.S.G. § 1B1.3(a)(1)(A), and reasoning instead that this subsection requires the defendant to have "an actual intent or desire that [his] actions create the specific result." *Gordon,* 64 F.3d at 283. Under this "specific intent" interpretation of subsection 1B1.3(a)(1)(A), the defendant's conduct could fall within this subsection "only in a very narrow set of circumstances, where the defendant had the intent to cause a guard or other non-participant to discharge a firearm." *Id.* Since the defendant "would have to be suicidal to intend that a guard discharge [his] firearm during a robbery," and because "[s]ection 2B3.1 is not meant to punish attempted suicides," the Seventh Circuit rejected the district court's application of the discharge enhancement. *Id.* at 283–84.

Although we question *Gordon*'s specific intent reading of subsection 1B1.3(a)(1)(A), *see, e.g., United States v. Williams,* 51 F.3d 1004, 1011 (11th Cir.1995) (discharge enhancement applicable because defendant " 'induced' [the victim] to fire his weapon" by approaching victim with his own firearm already drawn) (citing U.S.S.G. § 1B1.3(a)(1)(A)), we reject the District Court's reliance on *Gordon* for a different reason. The Seventh Circuit neglected to consider another subsection of the relevant conduct provisions of section 1B1.3 in conjunction with the subsection relied upon by the Government in that case:

(a) [S]pecific offense characteristics ... shall be determined on the basis of the following:

(3) *all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions....*

U.S.S.G. § 1B1.3(a)(3) (emphasis added). A commentary to this subsection states that the term "harm" includes "bodily injury, mone-

tary loss, property damage and any resulting harm." *Id.* comment. (n.4).

Included within the "subsection (a)(1)" cross-referenced in subsection 1B1.3(a)(3) are the following provisions:

(a) [S]pecific offense characteristics ... shall be determined on the basis of the following:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.

U.S.S.G. §§ 1B1.3(a)(1)(A), (B). In *Gordon,* the relevant subsection to be considered in conjunction with subsection 1B1.3(a)(3) was subsection 1B1.3(a)(1)(A) because the defendant acted alone, while in the present case the subsection that must be considered together with subsection 1B1.3(a)(3) is subsection 1B1.3(a)(1)(B), since Molina acted in concert with several co-conspirators.

The plain language of subsections 1B1.3(a)(3) and 1B1.3(a)(1)(B), read together, indicates that the bodily injury enhancement of subsection 2B3.1(b)(3) must be applied to Molina even if the harm to the victim was the immediate result of a bullet fired from the weapon of a guard. Since we have already concluded that it was reasonably foreseeable to Molina that Serrano and Santiago would discharge their weapons during the commission of the robbery to further the aims of the conspiracy, if the injury to the victim can properly be characterized as a "harm that resulted from" the co-conspirators' acts of discharging their weapons at the armed guards, then the bodily injury enhancement must be applied to Molina's sentence. The only remaining question, therefore, is whether the victim's injury "resulted from" Serrano's and Santiago's discharge of their firearms.

Case law interpreting the "resulted from" language of subsection 1B1.3(a)(3) is surpris-

ingly sparse.[2] However, courts have considered similar language found in section 5K2.1, which permits the sentencing court to increase the defendant's sentence above the authorized guideline range "[i]f death resulted." In *Williams,* for instance, the Eleventh Circuit upheld the sentencing court's upward departure based on this section where the victim was killed by a bullet from a co-victim's weapon when the co-victim attempted to fend-off the defendant's armed attempt to "carjack" the victims' vehicle. 51 F.3d at 1006, 1012. Noting that "when determining whether a death 'resulted' from the offense for purposes of section 5K2.1, a factual finding 'that death was *intentionally or knowingly risked*' is sufficient," *id.* at 1012 (emphasis added) (citations omitted), the Court in *Williams* concluded that the departure was warranted because "[i]n approaching the truck with a weapon, [the defendant] knowingly risked the lives of its occupants; he '"*put into motion*" a chain of events that contained an "inevitable tragic result."'" *Id.* (emphasis added) (citation omitted). Other cases have similarly interpreted the "resulted [from]" language of section 5K2.1. *See, e.g., United States v. White,* 979 F.2d 539, 544–45 (7th Cir.1992) (where victim, sixteen-year-old prostitute, was murdered by customer, upward departure proper for defendant convicted of interstate transportation of minor for purpose of prostitution, because defendant's convicted conduct "put into motion a chain of events that contained an inevitable tragic result" and because victim's death was "foreseeable" outcome of defendant's actions) (quotations omitted); *United States v. Rivalta,* 892 F.2d 223, 232 (2d Cir. 1989) (sentencing court must find that death was "'intended or knowingly risked'" by the defendant's conduct to justify upward depar-

ture under subsection 5K2.1) (citation omitted); *United States v. Salazar–Villarreal,* 872 F.2d 121, 123 (5th Cir.1989) (upward departure proper for defendant convicted of transporting illegal aliens within the United States because defendant's "reckless and injurious" flight to avoid capture foreseeably resulted in accidental death of aliens hiding in defendant's vehicle); *see also United States v. Walls,* 80 F.3d 238, 241–42 (7th Cir.1996) (upholding upward departure under subsection 2K2.1(c) (applicable when "death results" from possession of weapon during commission of another offense) "[r]egardless of whether [the defendant] fired the fatal shot" because his conduct of leading group of armed men to third party's house in order to threaten him was "intentional or reckless" and bystander's death was "a foreseeable risk of [the defendant's] conduct").

Analogously, since it is evident that Serrano and Santiago "knowingly risked" bodily injury to victims when they discharged their weapons in an attempt to rob an armored car protected by armed guards on a busy street during the middle of the day, the injury to the bystander is properly characterized under subsection 1B1.3(a)(3) as a "harm that resulted from" the co-conspirators' discharge of their weapons. Because Molina is liable for the co-conspirators' discharge of their weapons under subsection 1B1.3(a)(1)(B), and for all harm resulting from those acts under subsection 1B1.3(a)(3), the District Court must apply the four-level subsection 2B3.1(b)(3)(B) enhancement to Molina's sentence since Serrano's and Santiago's discharge of their firearms "put into motion a chain of events" that contained the "inevitable tragic result" of the bullet being lodged in the bystander's foot. *See United States v.*

---

2. The few decisions that have commented upon subsection 1B1.3(a)(3) have interpreted its "resulted from" language to require a showing that the harm to be attributed to the defendant was "caused" by the defendant's criminal conduct, *see United States v. Needle,* 72 F.3d 1104, 1115 (3d Cir.1995) (Becker, J., concurring in part and dissenting in part) ("[T]he plain meaning of 'resulted from' connotes causation."), *amended by* 79 F.3d 14 (3d Cir.1996), or that the harm "flowed naturally from" the defendant's criminal acts, *see United States v. Fox,* 999 F.2d 483, 486 (10th Cir.1993).

As originally promulgated, this subsection made the defendant liable for harm that was "caused intentionally, recklessly or by criminal negligence." These terms were not defined in the guideline or in the accompanying commentary. *See* Thomas W. Hutchinson & David Yellen, *Federal Sentencing Law and Practice* 47 (2d ed.1994). Effective November 1, 1989, the Sentencing Commission "deleted the [aforementioned] language from subsection (a)(3) as 'unnecessary.'" *Id.* (citing U.S.S.G. App. C, amend. 76).

*Fitzwater,* 896 F.2d 1009, 1012 (6th Cir.1990) (upholding bodily injury enhancement where the bank teller/victim "hit her head and hip on her teller's drawer in the course of lying down on the floor during the robbery," despite fact that defendant was "outside the bank in a getaway car" when the victim sustained her injury, because it was "reasonably foreseeable [to the defendant] that participation in concerted criminal conduct to rob a bank might result in the infliction of such an injury to a bank teller").

■ Finally, we note that nothing in the text or substance of subsection 2B3.1(b)(3) precludes its application when the victim is injured by a bullet from a guard's weapon. Unlike the "firearm employment" enhancements in subsection 2B3.1(b)(2), for instance, which, as both parties in *Gordon* conceded, would become "senseless" if "a robbery defendant [were given] an upward adjustment each time a guard or some bystander brandished or otherwise used a firearm," *Gordon,* 64 F.3d at 283, it is entirely sensible to conclude that an enhancement under subsection 2B3.1(b)(3) is appropriate whenever a victim suffers bodily injury as a direct and foreseeable result of the defendant's or his co-conspirators' criminal conduct. Although it would be unusual to punish a defendant more severely when a bystander or law enforcement officer decides to display, brandish, or discharge a firearm, punishing a defendant more severely for foreseeable harms flowing from criminal conduct that intentionally or knowingly risked those harms—for instance, in the felony-murder context—is not an unusual aspect of Anglo–American criminal jurisprudence.

### Conclusion

For the foregoing reasons, we conclude that the District Court's finding that Molina could not reasonably foresee that his co-conspirators would discharge their weapons during the robbery was clearly erroneous, and that the Court erred in holding that the bodily injury enhancement of subsection 2B3.1(b)(3) could not be applied in this case.

We therefore vacate Molina's sentence and remand for resentencing with directions to add a seven-level enhancement under subsection 2B3.1(b)(2)(A) in place of the five-level enhancement previously imposed under subsection 2B3.1(b)(2)(C), and to add, in addition, a four-level enhancement for serious bodily injury under subsection 2B3.1(b)(3).[3]

---

**3.** The cumulation of the seven- and four-level enhancements does not exceed the eleven-level maximum that the Guidelines specify where both the discharge and injury enhancements apply. U.S.S.G. § 2B3.1(b)(3).