**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 16 2001**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MICHAEL J. FORTIER,

      Defendant - Appellant.

No. 99-6381

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 95-CR-111-VB)**

---

Michael G. McGuire, Tulsa, Oklahoma for the Defendant-Appellant.

Sean Connelly, Special Attorney to the United States Attorney General, Denver, Colorado for the Plaintiff-Appellee.

---

Before **EBEL**, **PORFILIO**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

    Defendant-appellant Michael Fortier pleaded guilty to several offenses stemming from his involvement with Timothy McVeigh and Terry Nichols prior to their bombing of the Murrah Federal Building in Oklahoma City in 1995. Fortier appealed his original sentence, and this Court vacated and remanded for

resentencing. See United States v. Fortier, 180 F.3d 1217, 1232 (10th Cir. 1999).

On remand, Fortier was resentenced to an identical prison term and a reduced

fine. Fortier appeals his second sentence claiming the district judge was

vindictive and erred in applying an upward departure.[1] Exercising jurisdiction

pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm.

## I

Our prior opinion, see Fortier, 180 F.3d at 1219-23, discusses the facts

culminating in Fortier's guilty plea and original sentencing; we reiterate relevant

facts for context. Fortier knew McVeigh and Nichols from their service together

in the Army. McVeigh informed Fortier of the plan to bomb the Murrah building

and provided him with many details of the operation months before the bombing.

Although Fortier refused to take part in the conspiracy and has not been charged

as a co-conspirator, he did sell some firearms Nichols had stolen from a gun

collector and gave McVeigh $2000 of the proceeds. The government has

---

[1] Fortier also challenged the district court's application of the U.S.S.G. § 2K2.1(c)(1) cross reference. The district court's reasoning regarding application of the cross reference is unclear. Although stating that the cross reference applied, the court's calculation of Fortier's offense level started with the offense level for the firearms offenses, rather than either of the involuntary manslaughter offense levels. Thus, despite its suggestion to the contrary, it appears that the district court did not utilize the § 2K2.1(c)(1) cross reference when actually calculating Fortier's offense level. Perhaps recognizing this, Fortier abandoned that claim in his reply brief, stating that discussion of the issue was "irrelevant." (Appellant's Reply Br. at 13.)

- 2 -

stipulated that it cannot trace any of that money to specific expenditures made in furtherance of the bombing.

After the bombing, Fortier pleaded guilty to conspiring to transport stolen firearms in violation of 18 U.S.C. § 371, transporting stolen firearms in violation of 18 U.S.C. §§ 922(i), 924(a)(2), making a false statement to the FBI in violation of 18 U.S.C. § 1001, and misprision of a felony in violation of 18 U.S.C. § 4. Fortier also assisted the government in prosecuting McVeigh and Nichols and testified against them at their trials.

At his original sentencing, the district judge sentenced Fortier to 144 months in prison and a $200,000 fine, applying the cross reference in § 2K2.1(c)(1) of the 1994 [2] United States Sentencing Guidelines Manual to calculate Fortier's offense level. Section 2K2.1(c)(1) states that if a defendant used or possessed a firearm in connection with another crime that resulted in death, the court must apply the most analogous homicide guideline from U.S.S.G. Chapter 2A1. The district court applied § 2A1.1, the first-degree murder guideline.

---

[2] All references to the United States Sentencing Guidelines are to the 1994 Guidelines Manual unless otherwise indicated. The 1994 Guidelines Manual was the version in effect at the time Fortier committed his crimes and the one used in his sentencing. See Fortier, 180 F.3d at 1224 n.1.

On appeal, this Court held that the district court erred in applying the first-degree murder guideline and concluded that the involuntary manslaughter guideline, "although not a perfect fit," was most analogous to Fortier's situation. Fortier, 180 F.3d at 1230. Because Fortier's base offense level without the involuntary manslaughter cross reference was higher, the cross reference did not apply. See id. ("The cross reference provides that the most analogous offense guideline under Chapter 2A1 must be applied only if 'the resulting offense level is greater than that determined' under the base offense level and specific offense characteristics found in section 2K2.1." (quoting U.S.S.G. § 2K2.1(c)(1)(B))). In remanding for resentencing we stated: "Our decision today . . . requires the [district] court to begin with a significantly lower [offense level] number. We expect our holding to dramatically affect Mr. Fortier's total offense level." Id. at 1232.

Prior to Fortier's resentencing, the district judge held three telephone conferences with counsel to schedule and set the parameters of the resentencing hearing. During the first two conferences, the hearing was rescheduled at the request of Fortier's counsel. At the third conference, held on September 24, 1999, Fortier's counsel inquired whether he would have the option of calling witnesses at the resentencing. In response, the district judge stated he "would not anticipate that we would have any evidence," (IV ROA at 43), or further

allocution by either Fortier or the victims of the Oklahoma City bombing at the resentencing hearing.

Two of the victims of the Oklahoma City bombing, appearing through counsel, filed a brief prior to Fortier's resentencing asking the court to impose an upward departure. Over objection, the district judge permitted the victims' brief to be filed as an amicus brief. Victims' counsel also filed a motion seeking to participate in oral argument.

At the resentencing hearing, the district judge permitted victims' counsel to participate and argue the proper interpretation of the Sentencing Guidelines. Victims' counsel urged a substantial upward departure, but asked the court to impose the same sentence as it had before to avoid additional litigation concerning the appearance of vindictiveness that might arise if the court ordered a longer sentence.

Reversing its prior statement, the court allowed defense counsel to present witnesses, whereupon counsel stated that because the court had previously indicated that no evidence would be taken at the resentencing, one of his witnesses was out of town. The district judge asked for a proffer, but defense counsel never made one. Defense counsel did not call his other potential witness, Fortier's wife, although she was present in the courtroom.

Fortier was resentenced to 144 months and a $75,000 fine. In so doing, the court stated it was again applying the U.S.S.G. § 2K2.1(c)(1) cross reference, although when calculating Fortier's offense level the court began with the offense level of twenty-four applicable to the firearms offenses and then departed upward by thirteen levels. The upward departures were based on several Sentencing Guidelines sections: § 5K2.1 (multiple deaths); § 5K2.2 (significant physical injury); § 5K2.3 (extreme psychological injury); § 5K2.5 (property damage); § 5K2.7 (disruption of governmental functions); and § 5K2.14 (endangerment of public health or safety). Another factor taking the case out of the 1994 Guidelines' heartland was the absence of the current terrorism guideline, § 3A1.4, from the 1994 version of the Guidelines applicable to Fortier's case. ( See V ROA at 142 ("In 1994, the Sentencing Commission had not envisioned a terrorist act in the United States encompassing the magnitude of death, destruction and devistation [sic] that was experienced in the Oklahoma City bombing.").) Fortier's offense level was then reduced by three levels for timely acceptance of responsibility, see U.S.S.G. § 3E1.1, and two levels for substantial assistance, see id. § 5K1.1. As a result of these departures and adjustments, Fortier's final offense level was thirty-two, a one-level decrease as compared to his initial sentencing.

**II**

Constitutional due process guarantees prohibit judges from vindictively imposing harsher sentences following a successful appeal. See North Carolina v. Pearce, 395 U.S. 711, 725-26 (1969); see also United States v. Sullivan, 967 F.2d 370, 374 (10th Cir. 1992). As this Court has explained,

> [t]he Constitution limits, but does not absolutely prohibit, a judge's power to impose a harsher sentence upon remand from an appellate court. In [ Pearce ], the Supreme Court emphasized that due process "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial . . . [and] that a defendant be freed of apprehension of such retaliatory motivation on the part of the sentencing judge." For this reason, "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear" to overcome a presumption of vindictiveness.

Sullivan, 967 F.2d at 374 (quoting Pearce, 395 U.S. at 725, 726).[3] The Pearce presumption of vindictiveness does not arise when a sentence after appeal is less than or equal to the original sentence. See United States v. Flinn, 18 F.3d 826, 830 (10th Cir. 1994). Rather, in such a case, the defendant must present "evidence of actual vindictiveness" to demonstrate a violation of due process. Id.

---

[3] While Pearce itself considered a resentencing following a successful appeal of a conviction, we have applied the prohibition against vindictive resentencing after a successful appeal of a sentence. See United States v. Flinn, 18 F.3d 826, 828, 830 (10th Cir. 1994) (reviewing the district court's resentencing after remand from a successful appeal challenging application of the Sentencing Guidelines); see also 5 Wayne R. LaFave et al., Criminal Procedure § 26.8(c), at 829 (2d ed. 1999).

Claiming that the resentencing process was plagued "with subtle but discernable forms of vindictiveness," Fortier argues that his current sentence is constitutionally defective. (Appellant's Br. at 21.) Having failed to raise this claim below, [4] our review is for plain error. See Flinn, 18 F.3d at 830 ("Because Defendant did not alert the sentencing judge to his vindictiveness claim, we review only for plain error." (citation omitted)); Sullivan, 967 F.2d at 374 (stating that when a defendant does not alert the trial judge to a vindictiveness claim, "appellate review is limited to correcting plain errors that affect substantial rights and threaten a miscarriage of justice." (citation omitted)). Under the plain error standard of review,

> there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

Johnson v. United States, 520 U.S. 461, 467 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)) (further internal quotations and citations omitted). However, "[w]e apply this standard of review with somewhat less rigidity given [a] claim [that] alleges constitutional error." United States v.

_____

[4] Fortier concedes in his reply brief that he did not raise his vindictiveness claim below.

Lindsay , 184 F.3d 1138, 1140 (10th Cir.) (citing    United States v. Jefferson   , 925 F.2d 1242, 1254 (10th Cir. 1991)),    cert. denied , 528 U.S. 981 (1999)  .

Relying on our previous panel's declaration that "[w]e expect our holding to dramatically affect Mr. Fortier's total offense level,"    Fortier , 180 F.3d at 1232, and his contention that receiving the same sentence on remand "side-stepped" the Tenth Circuit's opinion, (Appellant's Br. at 21), Fortier argues that we should apply the   Pearce presumption.  We decline to do so because the     Pearce presumption is inapplicable when a defendant receives the same sentence on remand.  See Flinn , 18 F.3d at 830 ("In the absence of evidence of actual vindictiveness, resentencing will not be considered vindictive if the defendant did not receive a net increase in his sentence.");    see also  United States v. Smith  , 930 F.2d 1450, 1456 (10th Cir. 1991) ("The argument that a resentencing to the same term of incarceration is 'more severe' because it is supported by different aspects of defendant's conduct is simply nonsensical.").

Alternatively, absent a presumption of vindictiveness, Fortier advances several instances of what he considers actual vindictiveness by the district court: (1) the resentencing hearing was originally scheduled for a day on which Fortier's counsel had a scheduling conflict; (2) the district judge gave interviews to and was quoted in   The Daily Oklahoman   newspaper; (3) the district judge allowed victims' counsel to participate in the resentencing process through

briefing and oral advocacy; and (4) the district judge told Fortier's counsel that he would not be permitted to present witnesses, and then reversed himself the day of the hearing, leaving Fortier's witnesses unprepared and unavailable. Neither the aggregate of the four reasons advanced, nor any subpart, warrants a conclusion that the trial court was vindictive.

## A. Scheduling

Fortier's scheduling claim borders on being frivolous. Acknowledging the conflict, the district judge scheduled pre-sentence telephone conferences to reschedule the hearing, and moved the hearing to a day requested by Fortier's counsel; all of this occurred more than a month before the original hearing date and more than two months before the rescheduled hearing actually took place. We do not understand how counsel can claim lack of ample notice. Crediting the trial court's willingness to conduct      telephone conferences and its prompt rescheduling of the hearing, nothing remains to support a claim of trial court vindictiveness.

## B. Newspaper Interview

In the wake of the Tenth Circuit opinion vacating Fortier's first sentence, The Daily Oklahoman   published an article containing an interview with the judge responsible for sentencing Fortier:

[Judge] Van Bebber agreed Wednesday he has options [in resentencing Fortier] but didn't know if he could increase Fortier's sentenc[e] beyond 51 months.

"We haven't sat down and re-evaluated the guidelines yet in view of the opinion. I suppose I could do a lot of things. I guess I don't know. . . . That's a matter I haven't researched yet," he said from the courthouse in Kansas City, Kan.

Nolan Clay, Fortier's Sentence Tossed Out, The Daily Oklahoman, July 1, 1999, at 1. Fortier cites Judge Van Bebber's comments as demonstrating a vindictive state of mind.

We read Judge Van Bebber's statements as benign: they express no opinion, indicate no animus towards Fortier, and demonstrate only that the judge was uncertain of his decision. Although not cited by Fortier, the government notes that the judge's statements may implicate Canon 3A(6) of the Code of Conduct for United States Judges, which states that "[a] Judge should abstain from public comment about a pending or impending proceeding in any court." While that language is broad, courts construing it have held that a judge's public comment does not create a per se appearance of bias. See In re Barry, 946 F.2d 913, 914 (D.C. Cir. 1991) ("[W]hile the district judge's extrajudicial voicing of his views . . . may be a violation of the Code of Conduct for United States Judges, see Canon 3(A)(6) (1990), . . . any such violation does not necessarily create an appearance of personal bias or partiality . . . ." (citing United States v. Haldeman, 559 F.2d 31, 132-36 (D.C. Cir. 1976) (en banc) (per curiam))). But

- 11 -

cf. United States v. Cooley, 1 F.3d 985, 995 (10th Cir. 1993) (finding that the judge's impartiality was questionable when he "appear[ed] on national television to state his views regarding the ongoing protests, the protesters, and his determination that his injunction was going to be obeyed").

As for Fortier's claim that "Nolan Clay, the writer, had numerous [additional] interviews with Judge Van Bebber while this re-sentencing was pending, as Clay advised this counsel and others," (Appellant's Br. at 23), Fortier provides no affidavit from Clay or any other support for his contention that other interviews took place. The lack of evidentiary support precludes review of that claim. See Scott v. Hern, 216 F.3d 897, 912 (10th Cir. 2000) ("Where the record is insufficient to permit review we must affirm."); SEC v. Thomas, 965 F.2d 825, 827 (10th Cir. 1992) (holding that in the absence of essential references to the record in a party's brief, this Court will not "sift through" the record to find support for the party's arguments (citations omitted)).

Perhaps, considering Canon 3A(6), Judge Van Bebber should not have granted an interview to The Daily Oklahoman. However, given the neutral nature of his comments, we do not discern any vindictiveness or indication of partiality, let alone any that rises to the level of plain error.

## C. Participation of Victims' Counsel

The district judge's decisions to allow counsel for two victims of the Oklahoma City bombing to file their amicus brief and argue for an upward departure during the sentencing hearing form the basis of Fortier's third allegation of vindictiveness. Fortier notes the government construed his plea agreement as precluding the government from arguing for an upward departure, a fact of which the district judge was aware during Fortier's original sentencing. Thus, the only way the district judge could receive any briefing or oral argument on the issue of upward departures was from a third party.

We have not found, and neither party has cited, any explicit authority either authorizing or prohibiting the kind of victim participation allowed by the district court. The government's arguments in support of the propriety of the participation by victims' counsel are unpersuasive. Morris v. Slappy, 461 U.S. 1, 14 (1983), holds that "in the administration of criminal justice, courts may not ignore the concerns of victims." Morris considered the interest of a victim/witness in avoiding "the ordeal" of testifying in a third trial. That concern is different to a material degree and much greater than that present in this case. Victims' counsel based their request to participate, in part, on Fed. R. Crim. P. 32(c)(3)(E). While that rule permits victims to "present any information in relation to the sentence," by its terms it only applies to sentencing for "a crime of violence or sexual abuse," and the crimes to which Fortier pleaded guilty are

neither violent nor sexual in nature.  Fed. R. Crim. P. 32(c)(3)(E); see also id. 32(f)(2) (defining "crime of violence or sexual abuse" as "a crime that involved the use or attempted use or threatened use of physical force against the person or property of another").  United States v. Nichols, 169 F.3d 1255, 1260, 1279 (10th Cir.), cert. denied, 528 U.S. 934 (1999), is thus unpersuasive because Nichols, unlike Fortier, was charged with a crime of violence as defined by Rule 32(c)(3)(E).

In the absence of any authority permitting the participation of victims' counsel, we harbor concerns about the propriety of the district court's rulings. Allowing third parties to argue for harsher sentences when the government is not permitted to do so by the terms of a plea agreement presents an opportunity for the government to achieve indirectly what it is prohibited from doing directly. Cf. United States v. Brye, 146 F.3d 1207, 1209 (10th Cir. 1998) ("Where the government obtains a guilty plea predicated in any significant degree on a promise or agreement of the prosecuting attorney, such promise must be fulfilled to maintain the integrity of the plea." (citing Santobello v. New York, 404 U.S. 257, 262 (1971)) (other citations omitted)).  The government is entrusted with representing the interests of society in prosecuting criminals appropriately; given the nature of Fortier's involvement with Nichols and McVeigh and his assistance with the Oklahoma City bombing case, the government concluded that the

appropriate resolution was to enter into a plea agreement with the defendant. Because Fortier could reasonably read that agreement to foreclose arguments for an upward departure, allowing victims' counsel to participate upset his expectations and undermined the benefit of his bargain.

Despite our misgivings, we nevertheless conclude that any error does not warrant reversal of Fortier's sentence. Most importantly, Fortier raises this claim to show vindictiveness on the part of the district judge, an allegation which, as stated above, we review for plain error. The dearth of law concerning the participation at sentencing of victims and their counsel outside of the scope of Rule 32(c)(3)(E) precludes the conclusion that the error was "plain"—it was neither "clear and obvious" nor "contrary to well-settled law." United States v. Whitney, 229 F.3d 1296, 1309 (10th Cir. 2000) (citation omitted). Moreover, we cannot determine whether victims' counsel actually had any impact on the judge's resentencing decision. The Re-Sentencing Supplement to the Presentence Report contains a lengthy discussion of sentencing options, including the grounds for upward departure utilized by the district judge. Victims' counsel were not permitted to view any portion of the Presentence Report or to participate in discussions with the probation officer in his drafting of the Report. Finally, we note the express language of Fortier's plea agreement: "Mr. Fortier further understands that his sentence will be determined in accordance with the

guidelines . . . , but that the judge may depart from those guidelines under some circumstances" and "Mr. Fortier understands, however, that the sentencing judge will have the sole discretion to determine the actual sentence, and the government cannot and does not make any promises, representations or predictions regarding what sentence the judge will impose." (I ROA Doc. 4, Plea Agreement Letter at 4, 5.)

### D. Ruling Permitting Fortier to Present Witnesses

Prior to the resentencing hearing, Fortier filed a Sentencing Memorandum in which he objected to the district court's pre-hearing telephone conference denial of his request to present witnesses. At the beginning of the resentencing hearing, the district judge noted Fortier's objection and granted his request to present witnesses: "You filed a sentencing memorandum . . . . [Y]ou wanted to know if you could offer witnesses and I will permit that. And if I made an earlier ruling when we had our telephone conference call, I'm reversing myself on that." (V ROA at 58.) Fortier construes the tardiness of this decision as effectively depriving him of the chance to present two witnesses because one was out of town and both were unprepared. Fortier had a pending objection to the judge's prior ruling, and he failed to make a proffer regarding the witnesses' testimony when given an opportunity to do so. Under these circumstances, the district judge's ruling in favor of Fortier was not vindictive.

## III

In reviewing an upward departure, we examine:

(1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable.

United States v. Collins, 122 F.3d 1297, 1303 (10th Cir. 1997). "We review all four steps of the departure analysis under a unitary abuse of discretion standard." United States v. Bartsma, 198 F.3d 1191, 1195 (10th Cir. 1999) (citing Collins, 122 F.3d at 1303). "[W]here the court's decision whether to depart rests on factual findings, the district court's decision is entitled to substantial deference." United States v. Whiteskunk, 162 F.3d 1244, 1249 (10th Cir. 1998) (citations omitted).

The fact that the district court departed upward on resentencing for the first time does not, by itself, warrant reversal. On remand from this Court, a district court may resentence a defendant on different grounds, considering different enhancements or departures, as long as they are not foreclosed by the scope of the appellate decision. See United States v. Talk, 158 F.3d 1064, 1069 (10th Cir. 1998) (holding that in resentencing after remand, "[t]he district court was only bound by the law of the case . . . , not by its own previous refusal to depart"); United States v. Smith, 116 F.3d 857, 859 (10th Cir. 1997) (holding that on

- 17 -

remand "the district court is free to reconsider the sentencing package de novo unless the appellate court specifically limited the district court's discretion on remand").

Both parties agree that the horror of death and destruction that resulted from the Oklahoma City bombing falls outside the Sentencing Guidelines' heartland and can support an upward departure. However, Fortier interposes, there is an insufficient nexus between his admitted wrongdoing and the Oklahoma City bombing to permit an upward departure—because he was not charged as a co-conspirator, he bears no legal responsibility for the bombing.

We have previously rejected that position. In Fortier, 180 F.3d at 1224-30, we considered whether Fortier could be sentenced according to any of the homicide cross references in Chapter 2A1 of the United States Sentencing Guidelines Manual and held that Fortier did not possess the requisite mens rea, malice aforethought, to be sentenced according to the first- or second-degree murder or conspiracy to commit murder guidelines, see id. at 1228. We concluded, however, that Fortier could be sentenced according to the involuntary manslaughter guideline because

> Mr. Fortier admits his conduct was tantamount to criminally
> negligent involuntary manslaughter. He should have known his sale
> of firearms had the capacity to further the bombing of the Murrah
> Federal Building (an offense he knew for certain would result in
> many deaths). A colorable argument may be made, however, given
> the facts proven in this case, that his conduct bordered on

recklessness. There is evidence in the record from which one could infer Mr. Fortier was actually aware of the risk but chose instead to disregard it.

Id. at 1229-30.

While not deciding whether Fortier's "conduct was more akin to criminal negligence or recklessness," id. at 1230, our prior opinion holds that Fortier bears sufficient legal responsibility for the bombing to support an upward departure. Several of the Guidelines relied upon by the district court for the upward departure permit an increased sentence where the specified harm "resulted" from the defendant's conduct. See U.S.S.G. §§ 5K2.1 ("If death resulted . . . ."), 5K2.2 ("If significant physical injury resulted . . . ."), 5K2.7 ("If the defendant's conduct resulted in a significant disruption of governmental function . . . ."). We have interpreted the words "resulted from" in the Guidelines as permitting "an increased sentence for harms that were a 'reasonably foreseeable' consequence of a defendant's conduct" even where a defendant did not directly cause the specified harm. United States v. Metzger, 233 F.3d 1226, 1227 (10th Cir. 2000) (citing U.S.S.G. § 1B1.3(a)(3) and approving a four-level enhancement where an off-duty police officer shot a bystander as the defendant attempted to flee a robbery). Fortier well knew—in great detail—McVeigh's and Nichols's plans to bomb the Murrah Building. See Fortier, 180 F.3d at 1220. Fortier also knew the guns he sold for McVeigh and Nichols were stolen as a "fund-raiser" to offset

expenses related to the bombing.  Id.  Although the government cannot directly trace any of the proceeds from Fortier's criminal activity, a reasonably foreseeable consequence of giving McVeigh and Nichols $2000 of the proceeds was to further the Oklahoma City bombing conspiracy.  See id. at 1229-30 ("[Fortier] should have known his sale of firearms had the capacity to further the bombing of the Murrah Federal Building.").  Considering these facts, the district court did not abuse its discretion in increasing Fortier's sentence based on the toll of the Oklahoma City bombing.[5]

---

[5]  The dissent argues that the "necessary chain of events" linking Fortier's crime to the Oklahoma City bombing "is not present in this case."  While we accept the premise that there need be such a chain of events, we disagree with the dissent's conclusion that the chain is lacking in this case.  The record reveals that Fortier's firearms offenses were a part of the chain of events:

(1) Fortier learned of the bombing conspiracy in September 1994.        Fortier , 180 F.3d at 1220.
(2) In November 1994, Nichols stole firearms, a crime described by McVeigh as a "fund-raiser" for the bombing.      Id.
(3) McVeigh and Fortier drove to Kansas (where the guns were stored) from Arizona (Fortier's home) via Oklahoma City.  McVeigh showed Fortier the intended target of the bombing and explained many details of the operation, including the spot where the Ryder truck carrying the explosives would be parked.  Id.
(4) When Fortier received the stolen firearms, in December 1994, "[i]t was understood between McVeigh and Fortier that Fortier could sell the firearms at gun shows to make money."  (I ROA, Doc. 133 ¶ 5.)
(5) In January 1995, McVeigh asked whether Fortier had sold any of the firearms.  Learning that Fortier had not done so, "McVeigh became upset" and "arranged for [Fortier] to sell the firearms."      Fortier , 180 F.3d at 1221.  Fortier sold the firearms at gun shows in February and March 1995.      Id.

(continued...)

- 20 -

## IV

In the absence of plain error sufficient to demonstrate vindictiveness on the part of the district judge and because the thirteen-level upward departure was supported by Fortier's knowledge of the possible consequences of his actions, we **AFFIRM** his sentence.

---

[5](...continued)

(6) "Nichols was angry" that McVeigh had given Fortier the stolen guns and "wanted $2,000 in return." Id. "Fortier immediately gave McVeigh $1,000" and later gave McVeigh an additional $1000. Id. (emphasis added).

(7) Both before and after Fortier paid McVeigh, Nichols and McVeigh were expending considerable amounts of money preparing for the bombing. The parties' stipulation lists some expenses: $457.48 for explosive grade ammonium nitrate fertilizer (I ROA, Doc. 133 ¶ 1); $2780 for nitromethane racing fuel and a handpump ( id. ¶ 2); $250 for the getaway car ( id. ¶ 8); $280.32 to rent the Ryder truck used to house the bomb (id. ¶ 9); "hundreds of dollars" for storage sheds (id. ¶ 11); "hundreds of dollars" for telephone calls made in furtherance of the bombing conspiracy ( id.); and "hundreds more" for motel rooms ( id.).

This evidence shows that Fortier's decisions to sell the firearms and to give some of the proceeds to McVeigh were links in the chain of events leading up to the bombing. Even though Fortier may not have promised to turn over the proceeds, and even though the government cannot trace any bombing expenditure to the money Fortier provided, there is a clear inference from this record that Fortier sold the firearms and turned over the money—both at McVeigh's and Nichols's urging—to help McVeigh and Nichols meet their considerable need for funds to finance a criminal conspiracy about which Fortier had intimate knowledge.

99-6381, *United States v. Fortier*

**PORFILIO**, Senior Circuit Judge, partial dissent.

While joining the remainder of the court's opinion, I respectfully dissent from Part III. After reflection, I think the stipulation of facts upon which the sentencing was based has greater importance in the propriety of upward departure than given by either this or the district court. Courts considering whether to approve enhancements of the nature employed by the district court have uniformly required that the harm done to a victim be reasonably foreseeable in the commission of the *crime of conviction*. In the context of the enhancements, reasonable foreseeability exists when the *crime of conviction* puts in motion a "chain of events" that ends with harm of a particular nature. Because none of the crimes to which Mr. Fortier pled guilty did so, the horror which befell the victims of Timothy McVeigh and Terry Nichols cannot be credited to him. For those reasons, I believe this court should conclude the sentences were legally improper.

Prior to the original sentencing, the Government and Mr. Fortier entered into a stipulation of facts which was submitted to the district court. In part, that stipulation stated:

> The United States has *no evidence* that when Fortier *received* the firearms from McVeigh *there was any agreement, promise or condition that Fortier would sell the firearms and return part of the proceeds to McVeigh and/or Nichols.*
>
> . . . .

> The United States has *no evidence tracing to any bombing expenditure* . . . the $2,000 given to McVeigh by Fortier for Nichols. The United States also has *no direct evidence that Michael or Lori Fortier had actual knowledge* that this $2,000 would be or was used to further or facilitate the bombing conspiracy.

(emphasis added).

What makes this stipulation critical to the sentencing considerations? In my judgment, it is because the language of the guidelines employed by the district court to justify upward departure requires a causal link between the crimes of conviction and the grounds for departure. I begin first by recalling the crimes to which Mr. Fortier pled.

There were four: (1) Transportation of Stolen Firearms; (2) Conspiracy to Transport Stolen Firearms; (3) False Statement to the FBI; and (4) Misprision of a Felony. None of these offenses bear any patent relationship to the crimes of which McVeigh and Nichols were convicted, nor could they have factually *resulted* in the harms relied upon by the district court for upward departure.

The court relied upon five separate guideline sections to conclude Mr. Fortier's crimes justified upward sentencing departure. All of them specifically require that the harms described in the particular guideline result from the crime of conviction. For example, sections 5K2.1 and 5K2.2 respectively allow an increase in sentence "[i]f death *resulted*" or "[i]f significant physical injury *resulted*." Similarly, section 5K2.3 allows an increase "[i]f a victim or victims

suffered psychological injury much more serious than that normally *resulting* from commission of the offense." Section 5K2.5 allows an increase "[i]f the offense *caused* property damage or loss not taken into account within the guidelines." Finally, section 5K2.7 allows enhancement "[i]f the defendant's conduct *resulted* in a significant disruption of a governmental function." (all emphases added). Moreover, all of the departures, except for that found in section 5K2.7, state the extent of the increase depends in part upon the "extent to which death or serious injury was *intended or knowingly risked*." (emphasis added).

Although **United States v. Molina** observed the "[c]ase law interpreting the 'resulting from' language of subsection 1B1.3(a)(3) is surprisingly sparse," 106 F.3d 1118, 1123 (2d Cir. 1997), it construed this phrase to permit applying the bodily injury enhancements in U.S.S.G. §§ 2B3.1(b)(2)(A) and (b)(2)(C) to all of the harm that was a "reasonably foreseeable" consequence of defendant's conduct. *Id.* at 1124-25 (seven-level § 2B3.1(b)(2)(A) and four-level § 2B3.1(b)(3)(B) enhancements justified because co-defendants' conduct "'put into motion a chain of events' that contained the 'inevitable tragic result' of the bullet being lodged in the bystander's foot"). We adopted this reasoning in **United States v. Metzger**, 233 F.3d 1226, 1228 (10th Cir. 2000), in affirming defendant's enhanced sentence under U.S.S.G. § 2B3.1(b)(3)(B), recognizing

defendant's flight and pursuit were links in the "chain of events" set in motion by his bank robbery. *See also **United States v. Walls***, 80 F.3d 238, 241-42 (7th Cir. 1996) (upward departure under U.S.S.G. § 2K2.1(c)(B) "if death results" based on criminal history of illegal possession of a firearm that "resulted in" death of an innocent bystander); ***United States v. Fox***, 999 F.2d 483, 486 (10th Cir. 1993) (all harm that resulted from unlawful use of unauthorized credit card included charges her husband made "which flowed naturally from" the unauthorized use); ***United States v. Fitzwater***, 896 F.2d 1009, 1012 (6th Cir. 1990) (two-level enhancement under § 2B3.1(b)(3)(A) because it is "reasonably foreseeable" that participation in bank robbery might result in "the infliction of such an injury to a bank teller"); ***United States v. Salazar-Villarreal***, 872 F.2d 121, 123 (5th Cir. 1989) (defendant's reckless flight and the resulting death of an alien and injury to others illegally transported provided factual basis for upward departure of sentence under §§ 5K2.1 and 5K2.2 policy statements).

Each of those cases bears a common thread making enhancement appropriate, even though the resultant harm was not an element of the crime of conviction. Each crime committed by a defendant started an unbroken chain of events - a continuum - that ended in unusual harm. Even though the defendant did not actually inflict the harm, his criminal act started an uninterrupted string of

circumstances from which the harm resulted. A careful examination of the record discloses that the necessary chain of events is not present in this case.

It is easy to see that the offenses of making a false statement to the FBI and misprision of a felony are temporally disconnected and thus impossible to link to the harm to the victims of the McVeigh-Nichols conspiracy. Indeed, they were committed *after* the explosion resulted in death and injury and in no way could have initiated the "chain of events" leading to the bombing. Because of that temporal disconnection, neither of those crimes could have caused the injury for the purpose of enhancement.

Although the remaining crimes of transporting stolen weapons and conspiring to do so took place before the bombing, they had no more of a linkage to the harm than the other two. The facts we know, augmented by the government's stipulation, make it difficult for me to understand how Mr. Fortier "intended" or "knowingly risked" that his transportation of stolen firearms would result in the bombing of the Murrah Building. Yet, the court finds this connection in Mr. Fortier's knowledge of the McVeigh plans.

Indeed, the court here states, "Fortier also knew the guns he sold for McVeigh and Nichols were stolen as a 'fund raiser' *to offset expenses related to the bombing*." See *ante*, at 19 (emphasis added). Yet, even if it were proven Mr. Fortier knew McVeigh and Nichols stole the guns to offset the expenses of their

conspiracy, that knowledge does not supply the proper nexus. In this case, the chain of events did not start with Mr. Fortier's knowledge of the McVeigh-Nichols conspiracy. In no way was it part of the continuum between the crimes of conviction and the harm to the victims. Indeed, it was collateral to the critical events, and the government has conceded as much.

First, the government's stipulation admits there is no evidence of any agreement between Fortier, McVeigh, and Nichols that Mr. Fortier was to sell the firearms when he received them. Second, Mr. Fortier was not a party to the theft of the guns nor to the supposed agreement to sell them and use the proceeds to further the conspiracy. Moreover, he only acquired a portion of the stolen guns as consideration for his agreement to accompany McVeigh to Kansas long after the guns had been stolen. *United States v. Fortier*, 180 F.3d 1217, 1220 (10th Cir. 1999). The evidence suggests Mr. Fortier's interest in the guns was not to further the bombing conspiracy, but to fatten his own wallet. Indeed, with McVeigh's cooperation, he transported his share of the guns to Arizona where he kept them for at least two months. It was only when McVeigh demanded he do so, he sold *some* of them at local gun shows. *Id.* at 1221. Although it is unclear how much money all these sales accounted for, we know Mr. Fortier ultimately gave McVeigh $2,000 assumably to transfer to Nichols. *Id.* We also know he made $2,100 from the first sale and conducted at least three sales, from which it may

logically be assumed he made more than the $2,000 he gave to McVeigh.  Finally, we do not know what Nichols did with the money he supposedly received from McVeigh, leading to the third critical point upon which I base my disagreement. The government has stipulated there is "no evidence tracing to any bombing expenditure . . . the $2,000 given to McVeigh by Fortier for Nichols."  Nor is there anything other than conjecture that links the $2,000 to the bombing.

I think these facts lead to only one conclusion.  There is simply no evidentiary basis within the record of this case for this court's conclusion the harm suffered by the Murrah Building bombing victims was "foreseeable" in the commission of the crimes of which Mr. Fortier stands convicted.  Without a factual nexus between crime and harm, that is, without evidence the harm was but a part of the continuum of events flowing from the crimes of conviction, there is no factual ground upon which foreseeability can be based.

As I view the paradigm upon which the district court relied, it is this: (1) Mr. Fortier knew McVeigh and Nichols were guilty of conspiring to bomb the Murrah Building, and indeed knew of the intimate details of how that crime was to be carried out; (2) he knew McVeigh and Nichols stole guns to help finance their crime; (3) Mr. Fortier came into possession of some of those guns; (4) the crimes committed by McVeigh and Nichols and their results were uncomparably horrific; (5) even though the crimes of which Mr. Fortier was convicted had no

factual connection with that horror, his associations and the harm suffered by the victims require he be punished far more severely than called for by the crimes of conviction. I can neither accept nor approve this view.

Indeed, the chain of events described in the court's footnote 5, which relies on this paradigm, has a facial logic, but it overlooks the necessity for commencing the chain with the crimes of conviction. The most notable discrepancy is that two of the crimes, misprision of a felony and making an untruthful statement to the FBI occurred *after* the bombing took place. There simply is no nexus between crime and harm in these instances. Although the court finds the nexus to the remaining crimes in Mr. Fortier's prior knowledge of the McVeigh-Nichols conspiracy, that knowledge only becomes significant if Mr. Fortier took the stolen guns to sell them for McVeigh and Nichols. The court assumes this was the situation, but the evidence obviates that assumption.

It is undisputed Mr. Fortier received some of the weapons for the limited purpose of paying him consideration for his accompanying McVeigh to Kansas. *Fortier*, 180 F.2d at 1220. There is no evidence that McVeigh gave that portion of the stolen guns to Mr. Fortier to sell to raise funds for the bombing conspiracy. Indeed, it was only after Nichols complained to McVeigh about his need for money that McVeigh asked Mr. Fortier to start selling guns in his possession. *Id.* at 1221. When coupled with the government's inability to establish that the

money Mr. Fortier gave McVeigh was used to offset expenses of the bombing conspiracy, the receipt of the weapons by Mr. Fortier and their subsequent sale cannot be part of a logical chain between his prior knowledge of the bombing conspiracy and the ultimate death and destruction. I do not believe there is a factual basis for the court's assumption. Moreover, I do not believe the gap in the logical chain of events between the crimes of conviction and the harm to the victims can be either ignored or explained. As I view the record, it is only surmise that supports the court's conclusion that the harm was foreseeable in the commission of his crimes.

I do not ignore the repugnance of the crimes of McVeigh and Nichols, nor do I minimize the pain, suffering, and damage visited upon their victims. Nonetheless, under our present guidelines, I believe those circumstances themselves do not justify the sentences meted out by the district court. I believe those sentences are contrary to law, and I would reverse and remand once again for resentencing.