**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 17, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

                         No. 14-8077

DELRAY QUIVER,

    Defendant - Appellant.
———————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 2:14-CR-00096-SWS-1)**
———————————————

James H. Barrett, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, and Grant Russell Smith, Research and Writing Specialist, with him on the briefs), Office of the Federal Public Defender, Cheyenne, Wyoming, for Defendant-Appellant.

Jason M. Conder, Assistant United States Attorney (Christopher A. Crofts, United States Attorney, with him on the brief), Office of the United States Attorney, District of Wyoming, Lander, Wyoming, for Plaintiff-Appellee.
———————————————

Before **HARTZ**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.
———————————————

**PHILLIPS**, Circuit Judge.
———————————————

    Delray Quiver pleaded guilty to assaulting, resisting, and injuring a federal

officer. At sentencing, the district court applied a four-level Sentencing Guidelines

enhancement for Quiver's "use" of a "dangerous weapon" (the officer's Taser) during the assault. U.S. Sentencing Guidelines Manual § 2A2.2(b)(2)(B) (U.S. Sentencing Comm'n 2013). Quiver appeals the application of the enhancement. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. BACKGROUND

### A. Facts

On January 15, 2013, Bureau of Indian Affairs (BIA) Police Officer Justin Friday was dispatched to a house in Ethete, Wyoming, which is located on the Wind River Indian Reservation. Officer Friday was responding to a call complaining about two intoxicated men creating a disturbance. Upon arriving, Officer Friday found Quiver and another man being loud and disruptive in their grandmother's house. Because of their behavior, she wanted them arrested and removed. After several minutes of negotiating, Officer Friday convinced Quiver to step outside so that he could arrest him. On their way outside, Quiver again grew uncooperative by impeding Officer Friday from escorting him by the arm. Once outside, Quiver tried to walk away from Officer Friday toward the road. Needing to arrest him, Officer Friday grabbed Quiver's arm to take him toward the patrol car, but Quiver pulled his arm away. To gain control of Quiver, Officer Friday tripped Quiver and pushed him face-down into the snow.

Soon before Quiver fully resisted him, Officer Friday removed the prong-mode cartridge from his X26 TASER, leaving drive-stun mode as the sole option.[1] As Officer Friday tried to subdue Quiver, Quiver managed to turn over and punch Officer Friday's face, breaking his glasses. During the ensuing struggle, Quiver took control of the Taser and drive-stunned Officer Friday's leg. Quiver's pressing the Taser against Officer Friday's thigh left two burn marks (the record also calls them puncture marks) from the Taser's electricity. Sometime during the altercation, Officer Friday regained control of the Taser, won the fistfight, and succeeded in subduing Quiver. After arresting Quiver, Officer Friday sought medical attention for injuries to his face, right hand, and thigh, and for Quiver's broken nose.

## B. Procedural History

Quiver pleaded guilty to forcibly assaulting, resisting, and injuring Officer Friday while he performed official duties, in violation of 18 U.S.C. § 111(a)(1) and (b).[2] In accordance with its Presentence Investigation Report (PSR), the probation officer recommended a four-level enhancement under U.S.S.G. § 2A2.2(b)(2)(B) for Quiver's use of a dangerous weapon during the assault. At sentencing, the district court applied this enhancement over Quiver's objection. All told, the district court

---

[1] Tasers can operate in either probe mode or drive-stun mode. In probe mode, a cartridge attached to the front propels two metal probes, which are attached to the Taser by wires. The wires deliver an electrical current to incapacitate the person targeted. In drive-stun mode, the Taser emits the same charge as in probe mode, but the electrical current can be delivered only by physical contact.

[2] In its indictment, the grand jury charged under 18 U.S.C. § 111(b) that Quiver had caused bodily injury to Officer Friday, but it didn't charge the alternative basis for an enhanced penalty under that section: using a dangerous weapon during the assault.

calculated a total offense level of 26 and criminal-history category of IV, resulting in an advisory-Guidelines range of 92 to 115 months' imprisonment.[3] The district court then varied downward to a 70-month sentence based on its view of the relative danger posed by Tasers as opposed to firearms.

## II. DISCUSSION

### A. Standard of Review

"When considering a district court's application of the guidelines, 'we review legal questions de novo and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts.'" *United States v. Cherry*, 572 F.3d 829, 831 (10th Cir. 2009) (emphasis omitted) (quoting *United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir. 2006)).

### B. Analysis

Section 2A2.2(b)(2) provides for a four-level specific-offense characteristic if the assault involved the use of a dangerous weapon. U.S.S.G. §§ 2A2.2 cmt. n.1, 1B1.1 cmt. n.1. Although § 2A2.2(b)(2) provides four alternative definitions of "dangerous weapon," we need look no further than the first. Under that definition, the government must prove by a preponderance of the evidence that a "dangerous

---

[3] The total offense level represented a base offense level of 14, 4 additional levels for using a dangerous weapon during the assault, 3 additional levels for causing bodily injury, 2 additional levels for being convicted under 18 U.S.C. § 111(b), and 6 additional levels for assaulting a government officer. U.S.S.G. §§ 2A2.2(a), (b)(2)(B), (b)(3)(A), (b)(6), 3A1.2(b). From this, the probation officer recommended subtracting 3 levels for Quiver's acceptance of responsibility and his timely notice to authorities of his intention to plead guilty. *See* U.S.S.G. § 3E1.1(a) and (b).

weapon" was "used."[4] We conclude that a Taser—even in drive-stun mode—is a dangerous weapon. In either drive-stun or probe mode, a Taser is "capable of inflicting . . . serious bodily injury," which is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(D), (L).

As the burn marks to Officer Friday's thigh show, a Taser in drive-stun mode is capable of causing serious bodily injury if applied to a sensitive spot, for instance, an eye. *Cf. United States v. Wallace*, 800 F.2d 1509, 1513 (9th Cir. 1986) ("[E]vidence was introduced at trial indicating that stun guns may cause permanent injury to eyes . . . ."). That leaves the question of whether the Taser was "used" during the assault. Unquestionably, by taking control of the Taser and applying it against Officer Friday's thigh, Quiver used the Taser. His use exceeded mere "brandishing, displaying, or possessing a . . . dangerous weapon." *See* U.S.S.G. §§ 1B1.1, cmt. 1(I), 2A2.2(b)(2)(C). For these simple reasons, we agree with the district court's conclusion that the four-level enhancement applied.

Yet Quiver takes a different view. For the enhancement to apply, he argues, a Taser in drive-stun mode *pressed against a thigh* must be capable of causing death or serious bodily injury. In so arguing, Quiver impermissibly uproots "capable of causing death or serious bodily injury" from the dangerous-weapon determination

---

[4] The exact language is "otherwise used," meaning used in a manner other than discharging a firearm but is "more than brandishing, displaying, or possessing." U.S.S.G. § 1B1.1 cmt. n.1(I).

and replants it as part of the use determination. In effect, he rewrites the guideline by requiring that a dangerous weapon be *used in a way* that it is "capable of" causing death or serious bodily injury.

We reject Quiver's interpretation because it contradicts the guideline's plain language. The guideline asks two questions: (1) did the assault involve a dangerous weapon; and (2) if so, was the dangerous weapon used (more actively than brandishing, displaying, or possessing it)? Because it focuses on these two questions, we can see that § 2A2.2(b)(2)(B) guards against a much lesser degree of risk than does Quiver's approach. Under the guideline, an assaulter's using a dangerous weapon in any fashion unleashes an unacceptable risk that death or serious bodily injury might follow. Its four levels apply whether or not any bodily injury ensues. When assaulters do in fact cause bodily injuries with dangerous weapons, the assaulters receive *extra* punishment under § 2A2.2(b)(3) based upon the severity of the bodily injury.

Another problem for Quiver is that his cited cases deal with situations different from his own. Courts in those cases have considered whether the § 2A2.2(b)(2)(B) enhancement applied when the instrument used to cause harm was one not ordinarily used as a weapon. *See, e.g.*, *United States v. Commanche*, 421 F. App'x 868, 869 (10th Cir. 2011) (unpublished) (involving an assaulter who used a box cutter to slash victims); *United States v. Tissnolthtos*, 115 F.3d 759, 761, 763 (10th Cir. 1997) (involving an assaulter who threw a piece of firewood at a victim, striking him in the head and causing the loss of an eye); *United States v. Dayea*, 32 F.3d 1377, 1380–81

(9th Cir. 1994) (evaluating the reach of § 2A2.2(b)(2)(B)'s dangerous-weapon enhancement and hypothetically noting that a person driving a car to a location where he assaulted a victim with his hands would not have "used" the car for guideline purposes); *United States v. Sanchez*, 914 F.2d 1355, 1358, 1363 (9th Cir. 1990) (approving a jury instruction in an assault-on-federal-officer prosecution defining "deadly weapon" as "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person," and concluding that driving a car directly at the federal officer was "using" it and not merely "brandishing" it).

We fully agree with those cases that an object not ordinarily used as a dangerous weapon can become a dangerous weapon depending on the manner of its use. In fact, the Guidelines say so. *See* U.S.S.G. § 2A2.2 cmt. n.1 ("'Dangerous weapon' has the meaning given that term in § 1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon (*e.g.*, a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury."). But Quiver acknowledges that a Taser *is* a weapon, going so far as to state that "[i]t is impossible to think of a purpose for a Taser other than as a weapon." Appellant's Reply Br. 5. Thus, a Taser (unlike the objects not ordinarily used as weapons referenced in his cited cases) need not depend on a manner of use to achieve the designation of a "dangerous weapon" under § 2A2.2(b)(2)(B).

Finally, Quiver cites cases with language opposing increased punishment when defendants used dangerous weapons innocuously. *See, e.g.*, *Smith v. United States*,

7

508 U.S. 223, 228, 232 (1993) (concluding that defendant "used" his firearm under 18 U.S.C. § 924(c)(1) by attempting to trade it for drugs, but noting that "the defendant who 'uses' a firearm to scratch his head" cannot receive "punishment under § 924(c)(1) unless it facilitates or furthers the drug crime"); *United States v. Sturgis*, 48 F.3d 784, 787–88 (4th Cir. 1995) (examining a conviction under 18 U.S.C. § 113(c)[5]—assault with a dangerous weapon—and concluding that an HIV-positive prisoner who bit correctional officers had used a dangerous weapon, his teeth, because "innocuous objects or instruments may become capable of inflicting serious injury when put to assaultive use"). The short answer here, of course, is that Quiver's use of the Taser was anything but innocuous. He got control of the Taser and actively used it as part of his assault on Officer Friday.

### III. CONCLUSION

The district court properly applied the four-level enhancement for use of a dangerous weapon. We AFFIRM Quiver's sentence.

---

[5] Congress redesignated 18 U.S.C. § 113(c) as § 113(a)(3). Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 170201, 108 Stat. 1796, 2042.