*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CHRISTOPHER PAUL SCHURR,

      Defendant-Appellant.

FOR PUBLICATION
January 25, 2024

No. 365104
Kent Circuit Court
LC No. 22-010260-FC

Before: SWARTZLE, P.J., and O'BRIEN and FEENEY, JJ.

SWARTZLE, P.J. (*dissenting*).

When he was shot and killed, Patrick Lyoya possessed a weapon—a Taser in drive-stun mode. The courts below and my colleagues on appeal fail to appreciate the inherent dangerous nature of this weapon. Although I agree with much of the majority opinion, I ultimately cannot agree with the majority's conclusion that we should affirm the finding of probable cause. Instead, I would vacate the district court's finding and remand for that court to reevaluate the evidence under an updated understanding of the law, including that the decedent possessed a "per se" dangerous weapon.

To begin, our statutes and case law generally describe a dangerous weapon as any instrument reasonably calculated and likely to produce death *or* serious bodily injury. See, e.g., MCL 750.82; MCL 764.1f(2)(b)(iii); *People v Savage*, 327 Mich App 604, 624-625; 935 NW2d 69 (2019); *People v Norris*, 236 Mich App 411, 415; 600 NW2d 658 (1999). Some instruments are specifically designed to be dangerous, while others merely become dangerous. Thus, in categorizing dangerous weapons, there are, broadly speaking, two categories of instruments: (1) those that are per se dangerous; and (2) those that become dangerous by use and purpose. 2B Gillespie Mich Crim L & Proc § 40:43, Dangerous weapons (2d ed); *id.* § 80:24, Concealed weapons—Other than firearms.

With regard to the first category, instruments that are designed to be inherently dangerous are considered dangerous per se. *People v Goolsby*, 284 Mich 375, 378; 279 NW 867 (1938). A prototypical example of a per se dangerous weapon is a firearm. With the second category, an instrument not designed to be inherently dangerous can become dangerous by the use and purpose of the person controlling it. *Id.* Examples of this include an automobile and a pool cue. See, e.g., *People v Sheets*, 138 Mich App 794, 799; 360 NW2d 301 (1984); *People v Bates*, 55 Mich App 1;

222 NW2d 6 (1974). This latter category is almost always a factual "totality of the circumstances" question for a jury.

Where does a Taser fit within this schema?

The dangerousness of the weapon was disputed by the parties before the district court as well as this Court during oral argument. The record suggests that the Taser had discharged both of its main cartridges, but Lyoya and defendant continued to wrestle over control of the weapon. In fact, as the district court observed, "Ultimately, Lyoya gained *exclusive control* of the handle of the Taser and was able to transfer it to his other hand." (Emphasis added.) Assuming both cartridges had been discharged, the Taser would not have been able to discharge an immobilizing charge (except under an unusual set of circumstances), but the weapon would still have been able to be used in drive-stun mode. Thus, based on what the district court concluded, Lyoya had exclusive control over a drive-stun weapon when he was shot and killed. How to categorize this weapon—(i) dangerous "per se" as a matter of law; (ii) potentially dangerous "by use and purpose" depending on the totality of the circumstances; or, even, (iii) not particularly dangerous at all— becomes an important matter for purposes of the preliminary examination and defendant's common-law defenses of fleeing-felon, meeting force with force, and self-defense.

In response to questioning by this Court, the prosecutor agreed that a Taser in drive-stun mode could be a dangerous weapon, albeit under a factual totality-of-the-circumstances standard to be decided by a jury, rather than a legal per se standard to be decided by a judge. With due respect, I disagree and conclude that a Taser in drive-stun mode is per se dangerous as a matter of law based on several considerations:

First, our case law holds that even an unloaded but otherwise functional firearm is a dangerous weapon. *People v Prather*, 121 Mich App 324, 329; 328 NW2d 556 (1982) (citing *People v Doud*, 223 Mich 120; 193 NW 884 (1923); *People v Williams*, 6 Mich App 412; 149 NW2d 245 (1967)). Thus, the immediate capability to kill, maim, or incapacitate is not a necessary finding for per se dangerousness. Second, a Taser in drive-stun mode is designed to inflict extreme, albeit temporary, pain on a person, and such pain can constitute a serious bodily injury under the law. See, e.g., *Savage*, 327 Mich App at 624-625; see also *United States v Quiver*, 805 F3d 1269, 1272 (CA 10, 2015) (noting that, under federal law, "serious bodily injury" is defined to include "extreme physical pain"). In fact, a Taser in drive-stun mode is akin to a cattle prod (though the former is generally much stronger), and there are reports that such weapons can be used as torture devices. See, e.g., *Smith v Burge*, 222 F Supp 3d 669, 689-690 (ND Ill, 2016). Third, as explained by the expert witness during the preliminary examination, in addition to extreme pain, a Taser in drive-stun mode can cause permanent physical injury to soft-tissue parts of the body, including crushing the eyes, groin, and trachea (and one could reasonably infer that physically injuring the trachea might well result in death). Fourth, a Taser in drive-stun mode shares some of the same diversionary "pain-infliction" features as pepper spray, and this Court has held that pepper spray is a harmful chemical substance and dangerous weapon. *Savage*, 327 Mich App at 622-627. Fifth and finally, several federal and state courts have similarly concluded that a Taser in drive-stun mode is a dangerous weapon. See, e.g., *Quiver*, 805 F3d at 1272; *United States v Agron*, 921 F2d 25, 26 (CA 2, 1990); *United States v Dickerson*, 678 F App'x 706, 715-716 (CA 10, 2017); see also *United States v Wallace*, 800 F2d 1509, 1513 (CA 9, 1986) ("[W]e hold that the trial court correctly found that the question of whether a stun gun is a dangerous weapon may

be determined as a matter of law."); *State v Howse*, 875 NW2d 684, 693 (Iowa, 2016) ("A stun gun, even if inoperable, is per se a dangerous weapon" under Iowa law).[1]

These points are not in serious dispute. Thus, taking them together, we have the following:

* a weapon designed to inflict extreme physical pain on a person

+

* a weapon that can permanently injure a person's soft-tissue body parts, including eyes, groin, and trachea

+

* a weapon that is so useful for inflicting pain that it can be used as a torture device

+

* a weapon that can be used by a person to inflict extreme physical pain when grappling and wrestling with another person

+

* a weapon that can be especially useful in diverting that other person's attention while grappling and wrestling—an especially concerning prospect where, as here, that other person has a firearm and other dangerous weapons on his body ripe for the taking

+

* a weapon found by several federal and state courts to be per se dangerous

=> a weapon (i) specifically designed, (ii) reasonably calculated, and (iii) likely to produce serious bodily injury

Or, in other words, a per se dangerous weapon.

At the time of the preliminary examination, it was an open question under Michigan law how to characterize the weapon. Indeed, a review of the record confirms that the district court viewed the Taser in drive-stun mode to be somewhat benign. This was an abuse of discretion, though an understandable error given the uncertain state of the law at the time of the hearing.

This Court has no justification, however, for now compounding the district court's legal error. The majority brushes this concern aside by observing, "[N]o precedent exists in Michigan to find that possession of a twice-fired Taser, with drive stun capabilities, is a dangerous weapon per se . . . " True enough at the time of the preliminary examination, but this Court *now* has the opportunity to clarify the law, announce the proper precedent, and remand for the district court to

---

[1] In *People v Yanna*, 297 Mich App 137; 824 NW2d 241 (2012), this Court observed that "Tasers and stun guns" are "plainly dangerous," though less dangerous than a handgun. The Court concluded that these weapons, as with handguns, are not "dangerous weapons for purposes of Second Amendment inquiries." *Id*. at 145; see also *District of Columbia v Heller*, 554 US 570, 627; 128 S Ct 2783; 171 L Ed 2d 637 (2008) (distinguishing between traditional arms protected by the Second Amendment and "dangerous and unusual weapons" like those "useful in military service—M-16 rifles and the like" that can be banned). The constitutional inquiry involving "dangerous weapons" under the Second Amendment is different than the one used for common-law and statutory offenses.

reevaluate the evidence through the correct, updated legal lens. This reevaluation is especially critical when considering that defendant had no duty to retreat, and thus was faced with a person who (i) ignored defendant's repeated, lawful commands; (ii) grappled and wrestled with defendant over several minutes; (iii) had possession of what *should be* considered a per se dangerous weapon; (iv) had possession of that weapon while still struggling with defendant; and (v) defendant had other weapons on his body that could be taken by the person.

But instead, by agreeing with the prosecutor that the jury should decide, as a matter of fact, whether a Taser in drive-stun mode could be a dangerous weapon, the majority necessarily finds, as a matter of law, that the instrumentality is not a per se dangerous weapon. Not only is this conclusion wrong as a matter of logic (see above), it is wrong as a matter of precedent. Specifically, in citing *Doss* as support, the majority conflates (i) the circumstance where a police officer is faced with a suspect holding an unknown object standing several feet away on a foggy night, with (ii) the circumstance where a police officer is faced with a suspect holding a known Taser in drive-stun mode while in hand-to-hand combat during broad daylight. The two circumstances might be comparable, but they are not materially comparable.

I am not unmindful that my colleagues disagree with my analysis. Anyone who respects the views of others should take pause in this type of circumstance—I do, and I have. But even with such respect and pause, I cannot escape the conclusion that a weapon specifically designed to inflict extreme physical pain and plainly capable of temporary and permanent physical injury should be considered per se dangerous by courts of this state. Viewing this weapon through a "totality-of-the-circumstances" lens to be decided by a jury on a case-by-case basis obscures the weapon's inherent, designed dangerousness and introduces legal uncertainty into situations like this where no one should want such uncertainty to exist.[2]

---

[2] On a final minor point, I briefly note that the circuit court took issue with the district court's consideration of the policies and procedures of the Grand Rapids Police Department with respect to the use of force. In doing so, the circuit court relied on *People v Fiedler*, 194 Mich App 682, 694-695; 487 NW2d 831 (1992). In that case, the prosecutor had offered evidence of the shooting policy of the Benton Harbor Police Department, and the district court had admitted this into evidence. *Id.* The circuit concluded that this was error, and the *Fiedler* Court agreed (albeit concluding that the admission was harmless). *Id.* at 695. Based on this, the circuit court in the present case concluded that the district court should not have admitted into evidence the Grand Rapids Police Department's use-of-force policies and procedures.

The circuit court read *Fiedler* too broadly. Generally speaking, a particular item can be admissible into evidence for one purpose but inadmissible for another. If the Grand Rapids Police Department's policies and procedures had been admitted for the purpose of setting the legal standard for the fleeing-felon rule or some other justification, then those policies and procedures would have to be excluded, as explained in *Fiedler*, 194 Mich App at 694-695. If, however, the policies and procedures were offered for a different purpose, such as evidence of Schurr's training or what a reasonable officer might do in a particular circumstance based on that training, then those policies and procedures might well be admissible. In other words, a department's policies and procedures are not universally excluded from the preliminary examination under *Fiedler*; rather, such policies and procedures must be offered for a proper purpose and, if otherwise sound, can be admitted for that proper purpose.

For these reasons, I cannot agree with the majority, and I must respectfully dissent.

/s/ Brock A. Swartzle